ANTONIO SURIANELLO, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 8343

August 31, 1976                    553 P.2d 942

*Morgan D. Harris,* Clark County Public Defender, and *Herbert F. Ahlswede,* Deputy, Las Vegas, for Appellant.

*Robert List,* Attorney General, Carson City; *George E. Holt,* Clark County District Attorney, and *H. Leon Simon* and *Rimantas Rukstele,* Deputies, Las Vegas, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

A jury found appellant Antonio Surianello guilty of first-degree murder. He was sentenced to life imprisonment without possibility of parole. In seeking reversal, he alleges that his

conviction was obtained in derogation of the Fourth and Fourteenth Amendments to the United States Constitution. We disagree, and affirm the conviction.

1. *The Facts.*

Paula Annas was found, savagely stabbed, lying in the doorway of her Las Vegas hotel room about 9:00 a.m. on March 31, 1974. She died within 15 or 20 minutes after being discovered by a hotel maid. Her blood-splattered room provided clues, but the perpetrator of the crime could not be immediately identified.

Five days later, April 5, at approximately 2:30 a.m., police officers in Colorado Springs, Colorado, were called by the owner of a local bar to investigate a burglary in progress. Officer Anderson, the first policeman to arrive on the scene, observed Antonio Surianello standing on an old water heater just outside the rear door of the bar. A louver to the door had been removed, and Surianello was attempting to enter the building. Officers Watson and Disch then arrived on the scene. Surianello told the officers he had been drinking in the bar, that he had arranged to meet with one of the bar maids after the bar closed, that she had failed to keep her promise, and that he had returned to recover money he had given her. Thereafter, the manager of the bar declined to press charges, requesting that Surianello be asked to leave the premises. The officers so advised Surianello and, feeling the matter was closed, Officers Anderson and Disch left.

Officer Watson walked with Surianello to the latter's car. Near the rear door of the bar, Watson noticed an automatic pistol lying partially exposed under the removed louver. The officer picked up the pistol and asked Surianello if it was his; Surianello stated it was. Watson then handcuffed Surianello and radioed the other officers to return to the scene. Thereafter, Watson looked into Surianello's car and observed credit cards lying on the console between the two front seats. Examination of the cards revealed that they bore the names "Raymond Gilner" and "Eileen Simmons". Surianello explained that he had purchased the gun and credit cards from "a hippie". The officers took Surianello to police headquarters.

Surianello, who, it was learned later, was a federal parole violator and driving a stolen car, had been staying at a motel in Colorado Springs. He asked permission to go to the motel and recover his belongings. The officers told him they could not enter his motel room without a search warrant or a consent to search signed by him. He signed a consent to search his

room, and the officers escorted him to the motel. There, Surianello, who was in handcuffs, told the officers the motel room key was in his jacket pocket. The officers removed the key from his pocket, gave it to him, and he opened the door. The officers, in gathering Surianello's effects, found a 4-inch switch blade knife and two books, entitled "Astrological Sex Murders" and "Brothels of Nevada".

The party then returned to the police station, where, during booking, Watson went through the contents of Surianello's wallet. Therein he found a scrap of paper bearing the name and telephone number of John Orr, a local resident. Orr and his wife had met Surianello several weeks earlier in Las Vegas and had invited him to visit if he ever came to Colorado Springs. When contacted by Watson, Orr related that Surianello had called from Las Vegas on April 1, stating that he would be driving through Colorado Springs and would stop by to say hello. Surianello also told Orr he had been out the previous evening with a girl who had been reported murdered the morning of his phone call. This information was forwarded to authorities in Las Vegas. Later, Surianello's fingerprints were taken in Colorado Springs, and exemplars forwarded to Las Vegas. Identical fingerprints had been found in numerous places in the victim's hotel room. The paper with Orr's name and phone number, and Orr's resulting account of the April 1 conversation with Surianello, thus led to identification of Surianello as the murderer.

2.  *The Probable Cause for Surianello's Arrest.*

Surianello's principal contention on appeal is that the district court erred in admitting into evidence the scrap of paper bearing John Orr's name and telephone number and the evidence that resulted therefrom, alleging this evidence was the product of an illegal arrest.

Surianello focuses his challenge upon Officer Watson's testimony under cross-examination at the suppression hearing. Watson there stated that he handcuffed Surianello as a protective measure during an investigatory detention.[1] Using the

---

[1] The following is an extract of pertinent part of Watson's testimony at the March 27, 1975, hearing on the motion to suppress:

"Q.  [by Clark County Deputy Public Defender Ahlswede].   At that time did you suspect Mr. Surianello of a crime?

"A.  [by Detective Watson of El Paso County, Colorado, Sheriff's office].   What are you referring to a crime?

"Q.  I am asking you was he suspected of anything?

"A.  A specific crime? No sir.

"Q.  Why did you stop Mr. Surianello?

subjective test for probable cause to arrest [see, e.g., People v. Miller, 496 P.2d 1228 (Cal. 1972)], Surianello argues that this "detention" was in fact an arrest without adequate probable cause, rendering the subsequent search of his person illegal. We need not reach the issue as to whether the officer effected an "investigatory stop" as opposed to an "arrest", for, even assuming an arrest occurred when Surianello was handcuffed, we find that under the Colorado law the record establishes probable cause did in fact exist.

Colorado Revised Statutes, Section 16–3–102 (C.R.S. 16–3–102) provides that a peace officer may arrest a person when he has probable cause to believe that an offense has been committed and has probable cause to believe that the offense was committed by the person to be arrested.[2] The Colorado Supreme Court has held that probable cause deals with the probability that a crime has been or is being committed. People v. Martinez, 475 P.2d 340 (Colo. 1970). This assessment is to be based upon the factual and practical considerations of everyday life, on which reasonable and prudent men, not legal technicians, act. People v. Clark, 476 P.2d 564 (Colo. 1970).

---

"...
"A. Because of the presence of the weapon.
"Q. But there had been no specific crime committed at this point, to your knowledge?
"A. There had not.
"...
"Q. Did you have probable cause to believe that a crime was committed at the time you put the handcuffs on Mr. Surianello?
"A. I believe I had probable cause to detain him. Stop right there.
"Q. Under what authority did you detain Mr. Surianello?
"A. For investigation, receiving stolen property.
"...
"A. It was strictly because it was 2:30 A.M. in the morning, quarter to three in the morning; suspicious party, report of a disturbance; and a gun at the scene; and my life endangered.
"Now, whatever you call it, you know, this is up to you. As far as my probable cause, I had it.
"Q. Probable cause for what?
"A. For protection of myself. The handcuffs by the car and the arrest is what you are after right now, am I correct?"
[2]C.R.S. 16–3–102(1)(c):
"(1) A peace officer may arrest a person when:
"...
"(c) He has probable cause to believe that an offense was committed and has probable cause to believe that the offense was committed by the person to be arrested. An arrest warrant should be obtained when practicable."

If the circumstances at the time of an arrest are sufficient to justify a finding that probable cause existed, the court will so find, even though the precise point at which the officer's hunch became suspicion and then progressed to reasonable belief is impossible to determine with certainty. Lanford v. People, 489 P.2d 210 (Colo. 1971). It is not imperative that the arresting officer at the time of arrest have a subjective belief that the arrestee is guilty of a particular crime in order to establish probable cause to arrest for that crime. Klingler v. United States, 409 F.2d 299, 304 (8th Cir. 1969). In Klingler, the officers made an arrest for vagrancy and conducted a contemporaneous search which revealed a pistol that later formed the basis for a Federal Firearms Act charge. The court held that, while there was insufficient probable cause with respect to vagrancy, there was probable cause to arrest for robbery. Upholding the arrest, the court said:

"Because probable cause for an arrest is determined by objective facts, it is immaterial that [the officer] . . . testified that he did not think that he had 'enough facts' upon which to arrest Klingler for . . . robbery. His subjective opinion is not material. . . . A constitutional safeguard predicated on an objective standard requires an even-handed application. . . ." See also State v. Joao, 533 P.2d 270 (Hawaii 1975); State v. Pederson, 424 P.2d 810 (Ariz. 1967), *cert. denied,* 389 U.S. 867 (1967).

Detective Don Disch of the El Paso County Sheriff's Department, Colorado Springs, Colorado, in testifying at the hearing on the motion to suppress in the instant case, succinctly expressed the circumstances before us:

"Q.  [by Clark County Deputy District Attorney Melvyn Harmon].   What did you do when you arrived back at the . . . Bar?

"A.   Well, Officer Anderson and I both arrived at the same time. Of course, you know, we are both on the same radio frequency. We both heard his [Officer Watson's] call for assistance at the same time. We just turned around and went back. And we both got out of the car and Deputy Watson was in the process of putting handcuffs on Mr. Surianello, . . .

". . . [D]ue to the hour of the night and circumstances already transpired and . . . [Surianello's] admitting to having a gun in his possession while all this was going on, it definitely gave us all the reason we needed to ask further questions and due to the fact the man did have a gun in his possession at that place at that time, he was taken into custody.

"Q. Why did you feel that the possession of the gun put a different type of light on the situation?

"A. Well, because we had already been told by Mr. Mills [manager of the bar] the man was unhappy with the club and management and employees and so forth.

"He tried to get back in after closing time. He was ejected from the premises and went around and tried to get in on another side of the building.

"And now we just found out that he had a gun with him at the time and this definitely gave us reason to believe that he had something pretty serious in mind in trying to get into a closed place of business with a gun. Definitely questionable activity."

Considering the evidence adduced at the hearing on the motion to suppress, probable cause existed to believe the following crimes had been committed: Attempted Burglary by Use of a Weapon (C.R.S. 40–3–5) and Carrying a Weapon with Intent to Assault (C.R.S. 40–11–2). And so we find nothing indicating improper conduct on Officer Watson's part suggesting that application of the exclusionary rule was mandated in this case. Accordingly, we find no error in the trial court's admitting evidence resulting from the arrest of Surianello. Robinson v. United States, 414 U.S. 218 (1973); Gustafson v. Florida, 414 U.S. 260 (1973).

3. *The Voluntariness of the Consent to Search Surianello's Room.*

Surianello filed a motion to suppress the evidence obtained by the officers from his hotel room.[3] The motion was grounded on his claim that the consent to search was not voluntarily given. The district judge at the time of the evidentiary hearing on the motion expanded the scope of the hearing by allowing Surianello to challenge the validity of his arrest and detention. In ruling from the bench, the trial court incorrectly applied the subjective test, yet nevertheless denied the motion to suppress, stating:

"The court finds, based on the officers' lack of probable cause from a subjective standpoint as testified to by the officer here, that the detention of the defendant was unlawful. This is not, however, necessarily dispositive of the issues in the case.

---

[3] It was not until Surianello's trial that it was shown that Officer Watson had obtained the slip of paper containing John Orr's name and telephone number from Surianello's wallet. The issue was properly preserved for appeal and is discussed *supra*.

"...

"The court also relies on Schneckloth v. Bustamonte as referred to yesterday, 93 Supreme Court 2041; a 1973 case.

"Rather than to go into a detailed description of my opinion regarding the case, it stands for the proposition that voluntariness has to be determined from the totality of circumstances. . . .

"...

"The defendant executed a consent form. And interestingly enough, that consent form set forth and implies to the defendant he had a right to refuse to give his consent. The requirement [is] above and beyond the requirement of Schneckloth.

"The defendant appears to be intelligent. He has been previously involved in the criminal process. He is not naive but sophisticated.

"And I think overwhelming [sic] important is the fact the defendant initiated the request. It was he who said, 'I want to get my clothes.'

"And the officers responded, and I think very wisely so, that they would not go near that motel room unless they had a search warrant or written consent of the defendant, which they obtained without duress and without coercion.

"...

"The defendant accompanied the officers during the search. It wasn't as if they obtained the consent and in his absence conducted an inch by inch search of the motel room. They packed his items of clothing, his personal property, in his suit cases. Put them in the trunk of the car and returned to the station.

"...

"I determine that the consent was voluntarily given and although there was inherent coercion, it is outweighed by the facts balancing on the side of voluntariness.

"The State has shown by clear and convincing evidence to the court's satisfaction that the consent was voluntarily obtained."

A reading of the record of the hearing on the motion to suppress supports the ultimate ruling of the district judge. Voluntariness of Surianello's consent is to be determined from the totality of the surrounding circumstances. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Surianello argues that, because his detention was unlawful and he was in police custody, his consent was not voluntarily given.

As discussed *supra,* Surianello was under lawful arrest. Even assuming his initial premise, as did the trial court, the result

Surianello urges does not follow—as the court below properly observed. In McIntosh v. State, 86 Nev. 133, 136, 466 P.2d 656, 658 (1970), where the defendant had been stopped by a police officer who lacked probable cause and while in custody consented to a search of his suitcase in the trunk of his car, this court said, in ruling on the validity of the consent:

"Obviously, the search of the suitcase was not incident to a valid arerst [sic], and if it is to be upheld it must depend upon appellant's consent. Consent for the search must be freely and voluntarily given by the individual. Proof of the voluntariness is a question of fact. [Citations omitted.] . . . However, the mere fact that the consent was given while in the custody of a police officer does not render the consent involuntary. [Citations omitted.]"

In Lee v. State, 86 Nev. 794, 796, 477 P.2d 157, 158 (1970), the defendant, at the request of a police officer, removed his shoes, one of which contained seconal capsules. Holding that Lee's removal of his shoes was voluntary, this court stated:

". . . [T]he mere fact it was given while in the custody of a police officer (or here the presence, because Lee was not yet placed under arrest) does not render the consent involuntary. State v. Plas, supra [80 Nev. 251, 391 P.2d 867 (1964)]; McIntosh v. State, supra.

"The circumstances preceding and surrounding the search and seizure do not indicate that force or threat of force, either physical or psychological, was exerted by either officer upon Lee, State v. King, 209 A.2d 110 (N.J. 1965), nor was there any indication or testimony that Lee resisted or objected, either verbally or physically, to the request of Officer Knudsen to remove his shoes. This amounts to affirmative assistance on his part and may be considered on the question of voluntariness of consent to waiver of a constitutional right. United States v. Smith, 308 F.2d 657 (2d Cir. 1962)."

The Supreme Court of the United States ruled earlier this year in United States v. Watson, 44 U.S.L.W. 4112 (U.S. Jan. 26, 1976), that postal inspectors who had probable cause to believe that a suspect possessed stolen credit cards and who effected a warrantless arrest pursuant to 18 U.S.C. § 3061(a) and regulations thereunder, despite time to obtain a warrant, did not violate the Fourth Amendment and that the defendant's consent to a subsequent search of his car, given while in custody on a public street, was voluntary under Schneckloth v. Bustamonte, *supra*.

In the instant case, after the defendant was lawfully taken into custody and given the *Miranda* warning, Surianello asked the officers if he might return to his motel room and retrieve his personal effects. The officers, unconcerned as to Surianello's personal effects, informed him that he would be unable to do so, but that if he knew anyone in the area, they could bring his belongings to him. Surianello answered by stating that he knew no one in the area and then asked the officers if they would accompany him to his motel room while he obtained his belongings. The officers declined, informing defendant that, due to police department policy, they could not enter his motel room unless they had a search warrant or unless the defendant signed a form entitled "Waiver of Search Warrant". After the officers supplied the form and filled in the appropriate blanks, the form was presented to Surianello for his signature. He read the form, and his signature was witnessed by one of the officers. During this procedure Surianello appeared quiet, responsive, and cooperative.

After the consent was executed, Surianello, with two officers, went to his motel room. There Surianello unlocked the door for the officers. All three entered the room, and the officers gathered Surianello's belongings and transported them to the police station.

Looking at the totality of the circumstances, we find, as did the district judge, that the consent to search was voluntarily given by Surianello, and therefore lawful.

It is perhaps well to pause to consider the ramifications, were we to actually adopt the meritless contentions of this appellant in a nebulous effort to restrain police conduct that, as here presented, strikes no chord of impropriety or threat to basic notions of propriety and reasoned individual freedom.

As Mr. Justice Powell, in speaking for the majority, said in Stone v. Powell, 44 U.S.L.W. 5313 (U.S. July 6, 1976), the primary justification for the exclusionary rule is the deterrence of police conduct that violates Fourth Amendment rights. The High Court then stated, at 5320:

"The costs of applying the exclusionary rule, even at trial and on direct review are well known. The focus of the trial, and the attention of the participants therein, is diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or

innocence of the defendant. As Mr. Justice Black emphasized in his dissent in *Kaufman* [v. United States, 394 U.S. 217, 237 (1969)]:

> " 'A claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitional rights; ordinarily the evidence seized can in no way have been rendered untrustworthy by the means of its seizure and indeed often this evidence alone establishes beyond virtually any shadow of a doubt that the defendant is guilty.' [Citation omitted.]

"Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice." (Footnotes omitted.)

Additionally, Surianello contends that the two paperback books, "Astrological Sex Murders" and "Brothels of Nevada", found by the officers in his room, should have been excluded from evidence on the further ground that their potential for prejudice substantially outweighed their probative value. The paperback book "Brothels of Nevada" was stamped "Lathrop Wells, Nevada". When viewed in conjunction with Exhibit 67–C, which was a map belonging to appellant whereon Lathrop Wells was circled and inscribed with a date preceding the date of the murder, it tended to establish appellant's proximity to the scene of the crime at the time of its commission. We entertain substantial doubt that the book "Astrological Sex Murders" should have been admitted to show motive or intent to act out events depicted therein. However, while admitting the book may have been error, we believe it was, in this case, harmless. Cf. Fairman v. State, 83 Nev. 287, 429 P.2d 63 (1967).

4. *The Jurisdiction of the District Court.*

Surianello's last contention is that Las Vegas, Clark County, where the crime occurred is not a part of the State of Nevada and that therefore the statutes of Nevada have no force and effect.

This jurisdictional issue, which is presented periodically, is, of course, meritless and is summarily rejected. For the record, however, it is true that the boundaries of Nevada, as described in Section 1, Article 14, of the Constitution of Nevada, did not include any lands south of 37° north latitude; the parcel of land that includes Clark County was added to Nevada on January 18, 1867, when Joint Resolution IX of the Third Session of the Nevada Legislature, Stats. Nev. 1867, at 145, was passed, accepting land that had been tendered to Nevada by an Act of the Congress of the United States, entitled "An Act concerning the boundaries of the State of Nevada," approved May 5, 1866. 14 Stat. 43.

The judgment of conviction is affirmed.

GUNDERSON, C. J., and BATJER, ZENOFF, and THOMPSON, JJ., concur.