COMMONWEALTH *vs.* ROBERT J. LaSOTA.

Nos. 89-P-639 & 89-P-831.

Essex. February 9, 1990. - July 19, 1990.

Present: WARNER, C.J., ARMSTRONG, & DREBEN, JJ.

*Rape. Child Abuse. Evidence*, Admissions and confessions, Relevancy and materiality. *Practice, Criminal*, Dismissal, Required finding, Indictment. *Unnatural Sexual Intercourse.*

At the trial of an indictment charging the defendant with five counts of rape and abuse of a child, his daughter, in which the critical issue before the jury was the credibility of the defendant and the victim, there was reversible error in the admission in evidence of a certain pamphlet, found among the defendant's personal papers in the attic of his home, which discussed incest in a favorable light. [23-28]

In the circumstances of a criminal case in which a judge had decided the defendant's motion to suppress certain items without holding an evidentiary hearing, the fact that a new trial was required on another ground was occasion for the court's directing that the motion be renewed and that, in such event, there be an evidentiary hearing followed by findings of fact. [28]

A criminal defendant was not, in the circumstances, entitled to dismissal of an indictment on the ground that it was based entirely on hearsay testimony. [28-29]

At the trial of an indictment charging five counts of rape and child abuse, it was error to deny the defendant's motion for required findings of not guilty on so much of the third, fourth, and fifth counts of the indictment as charged unnatural sexual intercourse. [29]

There was no merit to a criminal defendant's argument that the Commonwealth's amendment to one count of the indictment was never allowed and that, therefore, there was error in the denial of his motion for a required finding of not guilty made at the close of all of the evidence on the ground of variance between the original indictment and the Commonwealth's proof. [29]

INDICTMENT found and returned in the Superior Court Department on September 2, 1987.

A motion to dismiss was heard by *John J. Irwin, Jr.*, J; the case was tried before *John T. Ronan*, J., and a motion for a new trial was heard by him.

*John P. White, Jr.* (*John T. Dawley* with him) for the defendant.

*Margaret J. Perry*, Assistant District Attorney (*Janice W. Howe*, Assistant District Attorney, with her) for the Commonwealth.

WARNER, C.J. After a jury trial in the Superior Court, the defendant was convicted on five counts of rape and abuse of a child (G. L. c. 265, § 23), his daughter. He raises several issues in these consolidated appeals from the convictions and the denial of his motion for a new trial.

*Background*

The events leading up to the defendant's arrest on May 27, 1987, began on April 8, 1987, when the victim, then sixteen years old, told a high school teacher that she had to leave her home. At first, she complained of having "nothing to do at home." She told her teacher, Robert Loiselle, that she felt "like a prisoner" at home and that the situation was "unbearable." As their discussion progressed, the victim reported that she was frequently hit by the defendant. Although she never expressly stated that she had been sexually abused, Loiselle inferred as much from her conduct. Loiselle got in touch with the Department of Social Services ("D.S.S.").

At a meeting with D.S.S. officials, the victim alleged that the defendant had sexually abused her since she was in kindergarten. She stated that, beginning in 1982 when she was in the sixth grade, the abuse included intercourse. She also reported that the defendant took her to a gynecologist in June, 1985, to obtain a prescription for birth control pills. The victim was placed in voluntary foster care the afternoon of that meeting.

On May 27, 1987, the victim met with an assistant district attorney and a police officer. She renewed her allegations of sexual abuse (fondling, tickling and petting) from the age of five and of rape. In addition, she reported that the defendant had taken nude photographs of her which, she said, were hid-

Commonwealth *v.* LaSota.

den in the family home. A search warrant issued that day and was immediately executed. It authorized a search of the defendant's home including "the attic and all rooms" for "sexually explicit pornographic child photos" of the complainant. No photograph was found. As a result of the search, the police seized a pregnancy testing kit discovered in a garment bag in the defendant's closet, a printed sheet of instructions for oral contraceptives found in the kitchen, and a pamphlet entitled, The Sex Life of Byron.

The Byron article was found in the attic amid academic papers and books belonging to the defendant, an assistant professor of family history at Salem State College since 1964. One paragraph of the Byron article was underlined in pen and is set out in the margin.[1] It describes incest as a potentially "warm and happy" relationship. Appended to the article was an annotation, apparently from an encyclopedia, on "incest." The annotation contains a paragraph, bracketed and underlined in part in pen, which suggests that genetic concerns regarding incestuous relationships have been overstated.[2,3]

*The Trial*

As the trial judge noted at the close of the evidence, the issues in the case were "sharply focused and hotly debated." The victim and the defendant gave vastly different accounts of their turbulent relationship, the extent of the victim's so-

---

[1] *"We know that an incestuous relationship . . . can prove a warm and happy one, and that the only danger to any children is that if harmful genetic factors exist in the family the possibility of these being transmitted is increased."*

The six-page pamphlet is undated. Beginning on the second page, the word PENTHOUSE appears in small print on the bottom of each page, apparently indicating that the material appeared in Penthouse magazine.

[2] "The alleged functions of incest taboos include the stabilization of family and society by specifying sex and marriage boundaries, the establishment of alliances between distinct kinship groups through the exchange of brides, and the prevention of inbreeding and its harmful biological results. *The last function has been increasingly challenged. A study of inbreeding in Hiroshima and Nagasaki, Japan, suggested that the inbreeding in the world today produces so few harmful effects that it may be ignored."*

[3] For convenience of reference, the pamphlet and annotation will hereafter be referred to as "the Byron pamphlet."

cial activities, her use of contraceptives, and of undiscovered, sexually explicit photographs of the victim. The critical issue before the jury was the credibility of these two witnesses. It is helpful to our discussion to summarize the testimony of the principal witnesses and describe the use of the Byron pamphlet.

a. The victim.

The victim testified at length about sexual abuse perpetrated on her by the defendant.[4] She stated that the abuse included vaginal intercourse and oral sex. Between July, 1982, and July, 1983, the defendant engaged her in intercourse at least once a week. Thereafter, the frequency of the abuse escalated to three or four times per week. By 1986-1987, when both of her older siblings were away at college, the victim regularly slept with the defendant in his bed at night, although she refused his demand that she move her clothing into his closet.

At some point beginning after July, 1983, the defendant forced her to pose for sexually explicit pictures. He told her that he needed these because she could not always be with him, and he dictated suggestive comments which she inscribed on the back of them. The victim stated that she and the defendant frequently argued about the pictures. He slapped her and threatened to send the photographs to Playboy magazine, or similar magazines, if she did not submit to his demands.

Between the ages of fourteen and sixteen the victim missed her menstrual period on approximately six occasions. Home pregnancy tests, which she said were given to her by the defendant, proved negative. In June of 1985, when the victim was fourteen years old, the defendant took her to a doctor for a gynecological exam and she was given a prescription for oral contraceptives.

The victim told the nurse practitioner who examined her that she had been sexually active with her boyfriend, a high

---

[4]The defendant and his wife separated when the victim was approximately three years old. The defendant was given custody of their three children. There was no contact between the children and their mother.

school football player. The defendant had concocted the story about a boyfriend and had coached her on how she was to respond to questions he anticipated she would be asked. The victim denied ever having had a boyfriend or even a date. The defendant retained control of the pills and would dispense one to her each morning. She said that sometimes after they argued he withheld the pills from her. It was on these occasions that the defendant engaged her in oral sex so as to avoid pregnancy.

The victim related constraints placed on her by the defendant. From early childhood he had restricted her from socializing with other children outside of school. The victim stated that she was not permitted to become close to her older sister and that, as a result, they did not enjoy a normal sibling relationship. Occasionally, she was allowed to attend "all girl" birthday parties. While in elementary school, where she was voted Miss [elementary school] her final year, she attended only one dance. She attended none at high school.

The victim explained that the defendant compelled her silence by warning her that no one would believe her story. He threatened that if she told anyone what was happening he would lose his job, the family would be ruined, and it would kill her paternal grandmother, for whom the victim had great fondness. The grandmother died in March, 1987.

b. The defendant.

The defendant denied ever having engaged in any form of sexual contact with the victim. He gave a very different account of the events leading to the request for contraceptives for the victim. He said that, in the spring of 1985, the victim appeared moody and depressed.[5] Upon inquiry, she confessed to him that she had made a terrible mistake. She told him that she had engaged in sexual intercourse with an older student. Because he could not be assured that the victim would refrain from sexual activities, he felt that medical advice was in order and scheduled an appointment for her. He denied

---

[5] The victim had given similar testimony.

her claim that he retained control over the pills. None was found during the search of the LaSota home. Following their conversation, he restricted the victim's activities, requiring that she inform him where she was going and with whom she was associating. He monitored her phone calls and required her to give him the phone numbers at which she could be reached when she went to a friend's house.

The defendant denied taking sexually explicit photographs of his daughter. In late February or early March of 1987 (just prior to the victim's complaint), he discovered five indecent photographs in the victim's closet. The victim appeared in four of the photographs; one depicted her sexually engaged with two males. The victim, apparently on a school holiday, was not at home. Shocked and upset, the defendant called a close friend and met with her later in the day showing her the pictures.[6] Subsequently, he put the photographs back in the victim's closet. He stated that he was afraid that if he confronted her directly with them, she would leave home, and that he feared for her safety. The defendant never saw the photographs again. When the victim returned home, approximately two days later, he told her that he "knew what she was involved in and that he was not going to let her get away with it." He slapped her and called her a "slut."

During the academic year 1986-1987, the victim had been staying out at night, frequently coming home after ten or eleven o'clock. On a few occasions, she had stayed out all night. They frequently argued about the victim's clothing, make-up, and behavior. After the photograph incident, he again clamped down on the victim's activities. She was prohibited from going anywhere unless he drove her to and from the destination. These restrictions remained in effect up until the time that the victim entered foster care.

---

[6]The friend had earlier testified to the fact of their meeting and the content of the photographs.

c. The victim's siblings.

The victim's brother and sister first learned of the alleged sexual abuse after the victim's April, 1987, disclosure.[7] At that time, both were away at college; the brother was a senior and the sister a freshman at different colleges.[8]

The sister, testifying for the Commonwealth, stated that the defendant apologized to her for what he had done, tearfully admitting that he was "very sick" and "needed help." The brother testified for the defendant. He stated that the victim admitted to him that she had only wanted to "get out of the house . . . things were unbearable there" but that the events she accused the defendant of had not occurred. He further testified that the victim told him that she was sorry, but that she could not go back and say that she had been lying. The brother's and sister's testimony conflicted in other pertinent respects tending to parallel the testimony of the victim and the defendant.

d. Other testimony.

The Commonwealth called several fresh complaint witnesses to corroborate the victim's testimony.[9] The defendant likewise called several witnesses, including women with whom he had been sexually intimate during the period covered by the indictment. As noted by the trial judge, none testified as character witnesses. Their testimony, if believed, would have corroborated the defendant's case.

e. The Byron Pamphlet.

The jury were presented with the fruits of the May 27, 1987, search. Prominent was the Byron pamphlet.

The jury first learned of the pamphlet at the end of the Commonwealth's opening statement:

---

[7]The brother is six years older than the victim. The sister three. The victim turned eighteen on October 13, 1988.

[8]The sister and the defendant had argued over her choice of college, prompting the sister to leave home for a few weeks during the spring of 1986, her senior year in high school.

[9]No issue is raised as to the propriety of the fresh complaint testimony. The victim's first complaint of abuse was made within one month of her paternal grandmother's death.

"As the police searched . . . , they went up through the house and they found a number of . . . items, and the item that you will see and will be able to look at . . . was a pamphlet. The name of the pamphlet was The Sex Life of Lord Byron.

"When the police officers opened that, in the middle of the contents of the pamphlet about the sex life of Lord Byron there were two areas underlined. The first area talked about what a happy and warm relationship incest can provide.

"The second paragraph that was underlined addressed the fact that the genetic problems from incestuous relationships and procreation from incestuous relationships really wasn't the worry that everybody thought it was."

During the prosecution's case-in-chief, the pamphlet was admitted in evidence, through the police sergeant who discovered it, and circulated to the jury.[10] The defendant, presumably, could not simply pass over the evidence. He sought to minimize its impact. On cross-examination, the defendant established that the pamphlet was found in the attic where it was stored with academic papers and books. During the defendant's case, he acknowledged that he "recognized" the pamphlet.

In cross-examination of the defendant, the prosecutor sought to establish that a Penthouse publication was not a proper academic work, the implication being that it had no place in the family history course taught by the defendant. Inquiry extended to the defendant's inclusion of "incest" as a topic on his course syllabus.

On redirect examination, the defendant's class bibliography (not reproduced in the record) was admitted in evidence.[11] With respect to the Byron pamphlet, the defendant

---

[10]The jury also had the pamphlet with them as they deliberated.

[11]Apparently other controversial topics including premarital sex were also discussed in class, and source readings came, in part, from so-called popular culture.

briefly stated that it had been given to him by a student and that he had not made any underlinings of the text. On re-cross-examination, the defendant testified that he could not remember the date on which he received the pamphlet, but that it had been about ten years prior, in the late 1970's.

The Byron pamphlet was highlighted at four points in the Commonwealth's closing argument. Twice it was referred to in passing as "that Penthouse publication." More extensive comment was also made:

> "The defendant is asking you to believe that it was someone else who gave him the *Penthouse publication* and that it was someone else who underlined the *Penthouse publication* on the Sex Life of Byron. And this someone else, by the way, gave it to him ten years ago and it was a student.

> .   .   .

> "[T]he defendant told you that some student had given him that. That he had not gotten it. That it had come to him from another source. Well, examine that, ladies and gentlemen. *Examine the underlinings.* Examine it as a piece of physical evidence that you are entitled to examine. Examine the bibliographies that the defendant offers to you as suggested readings for the History of the American Family and ask yourself: *Is this Sex Life of Byron published from Penthouse an academic monograph?*" (Emphasis supplied.)

No limiting instruction was sought or given. See *Commonwealth v. Yelle*, 19 Mass. App. Ct. 465, 471 (1985).

*Discussion*

1. On appeal, the defendant contends that the Byron pamphlet was not relevant to any material issue in the case but served only as an evidentiary harpoon directed at his character. He urges that its admission was not harmless error where the crucial issue at trial was the credibility of the two principal witnesses. The Commonwealth argues that the pamphlet was permissible predisposition evidence. See *Com-*

monwealth v. *Bemis*, 242 Mass. 582 (1922); *Commonwealth v. King*, 387 Mass. 464, 469-472 (1982).[12]

In order to be admissible, evidence must meet the threshold test of relevancy, that is, it must have a "rational tendency to prove an issue in the case." *Commonwealth v. Fayerweather*, 406 Mass. 78, 83 (1989). Although "evidence 'need not establish directly the proposition sought,' " *Commonwealth v. Yesilciman*, 406 Mass. 736, 744 (1990), it must "render[ ] the desired inference more probable than it would have been without it" (citations omitted). *Commonwealth v. Fayerweather, supra.* See *Commonwealth v. Gordon*, 407 Mass. 340, 351 (1990). Even where evidence is relevant, there must be a determination whether its probative value is outweighed by the unfairly prejudicial effect it might have on the jury. See *Commonwealth v. Lewin (No. 2)*, 407 Mass. 629, 631 (1990). Questions of relevancy and prejudicial effect are entrusted to the trial judge's discretion and will not be disturbed except for palpable error. *Commonwealth v. Tobin*, 392 Mass. 604, 613 (1984). *Commonwealth v. Lewin (No. 2), supra.* In its brief, the Commonwealth argues that the underlined and bracketed portions of the Byron pamphlet, see notes 1 & 2, *supra*, "had a tendency to show that whoever emphasized the text may have endorsed 'incest,' and thus may have had an inclination to commit [incest] . . . . [T]he article had a rational tendency to show that the defendant might have committed the acts with which he was charged and hence was 'relevant.' "

In support of this contention, the Commonwealth relies on the well settled rule that, in a prosecution for "illicit sexual

---

[12]Following his denial of the defendant's motion to suppress the pamphlet and other items seized on execution of the search warrant, the judge ruled that the Byron pamphlet would be admissible at trial. The defendant had not presented a motion in limine directed to the admissibility of the pamphlet. Twice the judge said that he noted the defendant's objection and that his rights were preserved as to it. In the circumstances, we consider the defendant's appellate rights to have been properly preserved; the Commonwealth makes no contrary argument. See and compare *Commonwealth v. Gabbidon*, 398 Mass. 1, 7 (1986); *Commonwealth v. Boyer*, 400 Mass. 52, 57 (1987); *Commonwealth v. Shea*, 401 Mass. 731, 740 (1988); *Dolan v. Commonwealth*, 25 Mass. App. Ct. 564, 566 n.2 (1988).

intercourse, evidence of the commission of similar crimes by the same parties . . ., if not too remote in time, is competent to prove an inclination to commit the [acts] charged in the indictment . . . and is relevant to show the probable existence of the same passion or emotion at the time in issue." *Commonwealth* v. *King, supra* at 470, quoting from *Commonwealth* v. *Bemis, supra* at 585. Although conceding that possession of the Byron pamphlet does not constitute a prior bad act, the Commonwealth observes that letters written by those charged with illicit sexual behavior have likewise been found probative of the relationship between the parties and of an inclination to commit the act charged. *Beers* v. *Jackman*, 103 Mass. 192, 193-194 (1869). *Sullivan* v. *Hurley*, 147 Mass. 387, 387-388 (1888).[13]

Undoubtedly, the Commonwealth was entitled to present evidence that the defendant was predisposed to commit the crimes charged. The question for decision is whether the Byron pamphlet rationally supports such an inference. The Commonwealth urges two bases for the inference. First, the Byron pamphlet discussed incest in a favorable light. Second, the defendant admitted that it was among his papers in the attic. From these facts alone, the inference that the defendant had or was likely to have had an incestuous relationship with his daughter is, we think, speculative. There was no evidence that the defendant had ever read the pamphlet,[14] that he approved of its content, or that he was responsible for underscoring or bracketing the text. Even were these links present, the inference would not be significantly advanced. Logic, experience, and common sense teach that textual underlining may reflect a full range of responses from abhorrence to approval. Less tenable still is a general supposition

---

[13]In *Commonwealth* v. *Healey*, 27 Mass. App. Ct. 30, 33-39 (1989), this court approved the introduction of a letter written by the victim with regard to her sexual relationship with the defendant where it was properly offered as a prior consistent statement.

[14]Despite lengthy cross and recross-examination of the defendant with regard to the Byron pamphlet, the prosecutor never asked the obvious question—whether he had read the pamphlet.

that opinions, beliefs, or behavioral proclivities may be determined from one's reading materials.

This is not a case in which the disputed evidence had direct connection with the crime charged. See *Commonwealth v. King, supra* (testimony regarding sexual paraphernalia used on the complainant properly admitted); *People* v. *Allison,* 115 Ill. App. 3d 1038, 1044-1046 (1983) (in prosecution for indecent assault on a child, sexually explicit books and magazines shown to child during incident admissible to corroborate child's testimony that he had been shown such materials and to establish that the physical contact had been sexually motivated); *Clifford* v. *State,* 474 N.E. 2d 963, 970-972 (Ind. 1985) (sexually explicit movie and magazine displayed to victim as well as sexual paraphernalia employed in commission of crime admissible).

Nor were the passages in issue sexually explicit or likely to arouse erotic passions. See *State* v. *Jenkins,* 7 Conn. App. 653, 654-655 (1986) (testimony by defendant's wife that she found sexually explicit magazines in his room depicting naked girls about the same age as the complainant probative of fact that defendant found young girls to be object of sexual interest and was not unduly prejudicial where the testimony was given in only a few lines and the magazines themselves were not admitted); *Watson* v. *State,* 147 Ga. App. 847, 850 (1978) ("girlie" pictures removed from defendant's briefcase shortly after arrest admissible since jury could permissibly infer that viewing the photographs may have encouraged defendant's perpetration of the crimes of kidnapping and sodomy). See also *Commonwealth* v. *DeCastro,* 24 Mass. App. Ct. 937, 938-939 (1987) (in drug prosecution where defendant raised defense of entrapment, prosecutor's brief reference during cross-examination of defendant to a book seized from his apartment entitled Legal First Aid for Today's High Society, created no substantial risk of miscarriage of justice in the circumstances).

We hold that in the circumstances the Byron pamphlet had no relevance to the defendant's predisposition to commit the crimes with which he was charged. Even if we were to

ascribe some probative value to the pamphlet, "its prejudicial potential and probable impact were considerable." *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. at 471. The trial judge's initial instincts were close to the mark —"[W]hat we have here . . . is a question of relevance in which you have a little probative value but [a] great bomb as far as prejudice going off."[15] The ideas expressed in the pamphlet were likely to offend the jury. The prosecutor's use of the pamphlet, and particularly her numerous references to it as "that Penthouse publication," sought to make the most of probable juror revulsion so as to depict the defendant "as a lewd man and to lead the jury to believe that a man of his character would be likely to commit the crimes charged." *Commonwealth* v. *Ellis*, 321 Mass. 669, 670 (1947). *Commonwealth* v. *Yelle, supra.*

The Commonwealth's argument that "the possibility for prejudice was diminished by the facts that the defendant was a professor of family history and that the subject of incest was encompassed within his coursework," is disingenuous. In lengthy cross and recross-examination of the defendant, the

---

[15]See *People* v. *Malkiewicz*, 86 Ill. App. 3d 417, 422 (1980) (testimony regarding four provocatively titled books, "Death List," "Trapped and Tied, Babysitters," "Tempting Teenagers," and "The Curious Nurse," found in defendant's car erroneously admitted where offered for sole purpose of showing criminal propensity and where there was no showing that the books belonged to the defendant; when or if he had read them; or what the contents of books were); *Surianello* v. *State*, 92 Nev. 492, 502 (1976) (in first degree murder prosecution, book entitled Brothels of Nevada and stamped "Lathrop Wells Nevada" properly admitted to establish defendant's proximity to scene of crime, but book entitled Astrological Sex Murders should not have been admitted to show motive or intent to act out events depicted therein); *People* v. *Chandler*, 65 A.D. 2d 920, 921 (N.Y. 1978) (in prosecution for rape, reference by officer that he observed "pornographic books" in defendant's apartment should not be admitted at new trial, since prejudicial effect outweighed probative value); *State* v. *Hunter*, 48 Or. App. 339 (1980) (photographs depicting defendant and his daughter touching tongues and noses properly admitted at incest trial, but magazine pictures of male and female genitalia and of couples engaged in sexual intercourse displayed by daughter with father's approval, and nude pictures of daughter taken by defendant's son and another, should not have been allowed in evidence since probative value was slight and prejudice strong).

prosecutor calculatedly sought to debunk any notion the jurors may have entertained that the topic of incest or the Byron pamphlet were properly academic. This theme was forcefully renewed in the Commonwealth's closing argument.

The admission of the Byron pamphlet constituted palpable error; its probative value was "nugatory or nearly so," *Commonwealth* v. *Yelle, supra*; the prejudice to the defendant was unquestionable and considerable; and the judgments must, therefore, be reversed.

2. The Commonwealth concedes that it was error for the judge to decide the defendant's motion to suppress the items taken during the execution of the search warrant in the defendant's home without holding an evidentiary hearing;[16] the judge did not, accordingly, make findings of fact. Further, the Commonwealth agrees that the judge incorrectly focused on the questions of the relevance and prejudicial effect of the evidence, rather than the facts attendant to the seizure. It argues, however, that the evidence developed at trial allows us to determine the merits of the defendant's motion to suppress. As there must be a new trial, in the circumstances we think the better course to follow is to direct that the motion to suppress may be renewed and that, in such event, there be an evidentiary hearing followed by the desired findings of fact. See *Commonwealth* v. *Harding*, 27 Mass. App. Ct. 430, 431 (1989).

3. There was no error in the denial of the defendant's motion to dismiss the indictment because it was based entirely on hearsay testimony. The defendant makes no claim that the grand jury proceeding was impaired or that the evidence presented was insufficient to warrant a finding of probable cause. Nor was there any "extraordinary circumstance" which makes the indictment vulnerable. See *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 655-657 (1979); *Commonwealth* v. *Nadworny*, 396 Mass. 342, 372 (1985), cert. denied, 477 U.S. 904 (1986); *Commonwealth* v. *Frei-*

---

[16]The prosecutor may well have misled the judge when she stated at the hearing on the pretrial motions, "There is a motion to suppress, non-evidentiary motion." The defendant made no protest.

*berg*, 405 Mass. 282, 301 (1989); *Commonwealth* v. *Pond*, 24 Mass. App. Ct. 546, 552 (1987); Mass.R.Crim.P. 4(c), 378 Mass. 849 (1979).

4. In view of our disposition, it is unnecessary to consider in detail other arguments of the defendant. We note, however, that it was error to deny the defendant's motion for required findings of not guilty on so much of the third, fourth, and fifth counts of the indictment as charged unnatural sexual intercourse. This is so because, as the Commonwealth concedes, there was nothing in the evidence as to those counts which would support a conviction on the basis of acts of unnatural sexual intercourse. The defendant acknowledges that there was sufficient evidence on each count to support a conviction of rape by sexual intercourse. There was also evidence, however, of other sexual contact and we cannot be sure that the jury did not think this supported a conclusion of unnatural sexual intercourse under the instructions given by the judge. See *Commonwealth* v. *Redgate*, 25 Mass. App. Ct. 965 (1988); *Commonwealth* v. *Eldridge*, 28 Mass. App. Ct. 936 (1990).

Also, there is no merit in the defendant's argument that the Commonwealth's amendment to count one of the indictment was never allowed and that, therefore, there was error in the denial of his motion for a required finding of not guilty made at the close of all of the evidence on the ground of variance between the original indictment and the Commonwealth's proof. The docket shows allowance of the motion on December 18, 1987, ten months before the beginning of trial. In any event, the defendant had a bill of particulars, ordered on the same date, which specified the same time period included in the amended count one. The time of the offense is not an element of the crime charged, see *Commonwealth* v. *King*, 387 Mass. at 467, and the defendant made no persuasive showing of surprise or prejudice. See *Commonwealth* v. *Whitehead*, 379 Mass. 640, 647-649 (1980).

The judgments are reversed and the verdicts set aside. Judgment is to be entered for the defendant as to so much of

the third, fourth, and fifth counts of the indictment as charged unnatural sexual intercourse.

*So ordered.*