NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-897                                            Appeals Court

COMMONWEALTH  vs.  CHRISTOPHER BRADSHAW.

No. 12-P-897.

Middlesex.      October 9, 2013. – July 29, 2014.

Present:  Cypher, Katzmann, & Maldonado, JJ.


Indecent Assault and Battery.  Dangerous Weapon.  Evidence,
     Relevancy and materiality, Motive, State of mind, Intent,
     Inflammatory evidence, Knife.  Intent.  Practice, Criminal,
     State of mind.


     Indictments found and returned in the Superior Court
Department on April 29, 2010.

     One case was tried before Diane M. Kottmyer, J., and one
case was tried before Paul A. Chernoff, J.


     Bruce Ferg, Committee for Public Counsel Services, for the
defendant.
     Fawn D. Balliro Andersen, Assistant District Attorney, for
the Commonwealth.


     KATZMANN, J.  A Superior Court jury convicted the defendant

of indecent assault and battery on a child under the age of

fourteen, G. L. c. 265, § 13B, as a lesser included offense of

aggravated rape of a child, G. L. c. 265, § 23A(a).  A second

Superior Court jury convicted the defendant of carrying a dangerous weapon when arrested upon a warrant, G. L. c. 269, § 10(b).  In this consolidated appeal, the central question is whether the admission of the defendant's statement that he was attracted to younger boys -- a category that includes the victim -- was reversible error because it amounted to impermissible character or propensity evidence suggesting that the defendant was likely to have committed the sexual assault.  The defendant also argues that the evidence was insufficient to support the dangerous weapon conviction.  We affirm.

Background.  1.  The party incident.  The first jury could have found the following.  On the evening of April 1, 2010, the defendant attended a party at the townhouse of the victim's mother, Mona.[1]  The victim, Billy, lived in the townhouse with Mona and his sister, Sarah.  At the time of the incident, Billy was nine years old and Sarah was twelve.  During the party, several adults -- including the defendant and Nirva Guirand, a friend of the defendant and of Mona -- were gathered upstairs in the mother's bedroom and drinking alcohol.  At the relevant time, Billy was asleep on the couch downstairs in the living room.  Sarah testified that she left her bedroom late at night

_____

[1] Pursuant to G. L. c. 265, § 24C, we employ a pseudonym for the victim.  To further insulate his identity, pseudonyms also have been assigned to the family members discussed in this opinion.

to go down to the kitchen. When she had partially descended the flight of stairs, she saw Billy lying asleep on the living room couch.[2] She saw that his shirt was raised and his pants were pulled down mid-way. Sarah testified that the defendant was leaning over Billy and licking his genital area. She testified that lights were on in the living room and that she was able to see the incident clearly.[3]

Sarah returned upstairs and told Mona about what she saw, generating substantial commotion in the household. After Billy woke up, he told Guirand that the defendant had not touched his leg and that he did not notice any change to his clothing or to the sheet covering him while he was asleep.[4] (Mona and Sarah testified that Billy was a sound sleeper.) The defendant did not testify, but in a statement to the police, he said that on the night in question he was intoxicated, and went downstairs and smoked a cigarette in the back yard and spoke to Billy, who was awake. The results of forensic testing of Billy's underpants and pajama pants for sperm, seminal fluid residue,

---

[2] Billy routinely slept on the couch rather than in his bedroom.

[3] Sarah was not wearing glasses when she discovered the defendant and Billy on the living room couch. Sarah acknowledged that her vision is blurry without her glasses. She also testified that her vision was better at the time of the incident than at trial.

[4] Billy's conversation with Guirand was read into evidence by stipulation.

and amylase (a component of saliva) were negative.  The chemist who processed the sexual assault evidence collection kit testified that it is easy for amlyase to rub off or be washed off clothing.

Immediately after the incident, Guirand went downstairs and found the defendant in the back yard, smoking a cigarette.  She asked him if Sarah "might have seen him touching himself or using the bathroom," and the defendant said no.  Several days after the incident, the defendant called Guirand by telephone.  In response to Guirand's question, "Did you touch [Billy]?" the defendant replied, "I don't think so."  Then the defendant stated to Guirand that "lately he's been finding himself attracted to younger guys," particularly between the ages of nine and fourteen, because they had not yet "developed and . . . started to have facial hair."[5]

---

[5] Guirand testified as follows on direct examination by the prosecutor:

> Q.:  "During that conversation, . . . did [the defendant] also tell you about a certain feeling that he had had as of late?"

> (Here defense counsel objected and was overruled.)

> A.:  "He said lately he's been finding himself attracted to younger guys."

> Q.:  "Did he provide an age range?"

> A.:  "He said between fourteen and nine."

2.  The arrest.  The second jury had the following evidence before them.  On April 7, 2010, an arrest warrant was issued for the defendant with respect to the April 1 incident.  Detective Beth Halloran of the Cambridge police department called the defendant and asked him to meet to "discuss some paperwork."  She planned to arrest him at the meeting but did not inform him of that.  The defendant chose the location -- near Central Square in Cambridge -- and asked to meet Detective Halloran alone.  Prior to this planned meeting, Detective Halloran had had several telephone conversations and one face-to-face meeting with him at the police station during her investigation.  For safety reasons, Detective Halloran arranged for three other detectives, in plain clothes, to station themselves at various locations surrounding the scene of the planned arrest.

When the defendant arrived at the agreed-upon location for the meeting, at approximately 8:30 P.M., Detective Halloran and the defendant recognized each other based on their previous meeting.  When the defendant approached Detective Halloran, who was standing still, he kept walking.  She testified as to their interaction:

> "He proceeded to continue walking past me, so I joined in
> with his walk, and I said, 'Where are we going?'  And he

---

Q.:  "Did he explain or did he give a reason for that?"

A.:  "He said he didn't like them once they developed and they started to have facial hair."

said, -- I said, "What are we doing," and he said, 'Keep walking.' So, I walked with him, and I said, 'Where are we going,' and he said, 'We're going to the tracks.' And I said, 'What tracks?'"

Detective Halloran was aware of nearby train tracks and joined the defendant in walking toward them. One of the other police officers, Detective James Diggins, began walking toward Detective Halloran and the defendant. When they approached each other, both officers took the defendant to the ground and then told him that he was under arrest. The defendant initially resisted but was quickly subdued.

When Detective Diggins first took hold of the defendant, he noticed an object sticking out of the top of the backpack that the defendant was wearing. When the defendant was forced to the ground, both detectives noticed a knife on the ground outside of the bag. The knife was later identified as a large kitchen knife. It measured fourteen and one-quarter inches in total length, including a nine-inch blade. There was no evidence that the defendant ever held the knife during the meeting or arrest.

Discussion. 1. Defendant's statement. With respect to the defendant's statement that he was attracted to young boys, which was admitted over the defendant's objection (see note 5, supra), the defendant argues first that it was impermissible character or propensity evidence suggesting that he was likely

to have committed a sexual assault on a boy.[6]  Second, the defendant argues that, even if the statement were probative of his motive, intent, or state of mind, it should have been excluded because its unfair prejudicial effect substantially exceeded its probative value.  We disagree.[7]

"[A]s a general rule, evidence of a person's character is not admissible to prove that he acted in conformity with that character on a particular occasion."  Commonwealth v. Bonds, 445 Mass. 821, 829 (2006), quoting from Liacos, Brodin, & Avery, Massachusetts Evidence § 4.4.1, at 130 (7th ed. 1999).  But otherwise inadmissible character evidence may be admitted for a proper purpose, such as proving motive or intent.  See Commonwealth v. Helfant, 398 Mass. 214, 224 (1986).  See also Commonwealth v. Simpson, 434 Mass. 570, 579 (2001) (defendant's statement showing state of mind admissible notwithstanding that "in other circumstances [it] could tend to prove guilt by evidence of bad character").  See generally Mass. G. Evid. § 404

---

[6] The defendant also argues that the evidence was impermissibly admitted as bad acts evidence.  Regardless of whether any bad acts evidence with respect to sexual acts would have been admissible had it been introduced, the evidence in question did not pertain to acts in the first instance:  it pertained only to the nature of the defendant's sexual attraction.

[7] Because the contested statement is the statement of a party opponent, it could not be excluded on hearsay grounds. Commonwealth v. Marshall, 434 Mass. 358, 365 (2001).  See Commonwealth v. Bright, 463 Mass. 421, 435 (2012) (statement of party opponent is nonhearsay); Mass. G. Evid. § 801 (2014).

(2014).  Whether evidence is relevant is "entrusted to the trial judge's broad discretion."  Commonwealth v. Simpson, supra.

The judge admitted the statement for a limited purpose. Before the testimony was given, the judge correctly instructed the jury, "You may consider it solely on the limited issue of whether or not the defendant had a motive to commit the crime that was charged in this indictment, and as to his state of mind and intent."  We agree with the trial judge that the statement was relevant with respect to the limited issues of motive, state of mind, and intent.  The defendant's statement that he was attracted to boys between the ages of nine and fourteen is relevant to explaining why he would touch a nine year old boy like Billy sexually and what the defendant might have been thinking the night that the incident occurred.  Not only did the defendant make this statement within several days after the incident, he did so in response to Guirand, his friend, asking him whether he had touched Billy.  Only after the defendant answered, "I don't think so," did he proceed to explain that recently he had been attracted to younger boys.  That his uncertain denial was followed with a statement that he was attracted to young boys reveals that the attraction he described was probative of a motive to engage in the alleged sex act and of his state of mind at the time when the incident occurred. See Commonwealth v. Lewin (No. 2), 407 Mass. 629, 631 (1990),

quoting from Commonwealth v. Bonomi, 335 Mass. 327, 347 (1957) ("An admission in a criminal case is a statement by the accused, direct or implied, of facts pertinent to the issue, which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to establish his guilt").

Just as "evidence of the commission of similar crimes by the same parties though committed in another place, if not too remote in time, is competent to prove an inclination to commit the [acts] charged in the indictment . . . and is relevant to show the probable existence of the same passion or emotion at the time in issue," Commonwealth v. King, 387 Mass. 464, 470 (1982), quoting from Commonwealth v. Bemis, 242 Mass. 582, 585 (1922), so too is the defendant's statement about his sexual attraction admissible to prove the "probable existence of the same passion or emotion" at the time the incident occurred. Cf. Commonwealth v. Hanlon, 44 Mass. App. Ct. 810, 817 (1998) (evidence of sexual acts admissible to show common plan or scheme). It is plausible that the defendant may never have acted on his stated proclivity, in contrast to a case involving the admission of evidence of similar crimes -- where a defendant has already committed those acts. But the evidence here is sufficiently probative with respect to questions of motive, intent, and state of mind that it survives the threshold inquiry into relevance. See Commonwealth v. Sicari, 434 Mass. 732, 750

(2001) ("Evidence is relevant if it has 'a rational tendency to prove an issue in the case,' or render a 'desired inference more probable than it would be without [the evidence]'" [citations omitted]).

Second, the defendant argues that even if there were a proper purpose for the testimony, such as showing motive or intent, it should not have been admitted because the prejudicial effect substantially exceeded the probative value. We disagree.

"We review a judge's decision whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice under the abuse of discretion standard." Commonwealth v. Bishop, 461 Mass. 586, 596 (2012). See Mass. G. Evid. § 403 (2014). We will not overturn such a decision absent palpable error. Commonwealth v. Bonds, 445 Mass. at 831.

Here, the judge carefully engaged in the required balancing of prejudice and probative value. Compare Commonwealth v. Little, 453 Mass. 766, 772 (2009). The judge acknowledged the potential prejudicial effect and admitted the postincident statement only after careful analysis as to its probative value. Indeed, the judge excluded a second statement by the defendant, made one year prior to the incident, that he was attracted to young boys, because of its unduly prejudicial effect. See Commonwealth v. Paulding, 438 Mass. 1, 12 (2002) (selective admission of several of defendant's prior convictions indicative

of judge's proper balancing of prejudicial effect and probative value).  With respect to the statement that was admitted, the judge provided a contemporaneous instruction, repeated in her final charge to the jury, correctly limiting the use of the statement to possible motives for the alleged act and the defendant's state of mind and intent at the time of the incident; she also instructed the jury explicitly that they could not use the information for propensity purposes.  See ibid.

The defendant's reliance on Commonwealth v. Darby, 37 Mass. App. Ct. 650 (1994), and on Commonwealth v. LaSota, 29 Mass. App. Ct. 15 (1990), is misplaced.  The circumstances of those cases bear little resemblance to those we address here.  In Darby, this court concluded that it was reversible error to allow the Commonwealth to introduce two photographs:  one of the child victim fondling himself while naked and one of the defendant clothed but with his erect penis exposed. Commonwealth v. Darby, supra at 652, 655-656.  With respect to the photograph of the victim, we concluded that its relevance, limited to the issue of the child's sexual knowledge, was "marginal at best" and that there already was "a plethora of evidence" on that issue.  Id. at 654.  We concluded that the photograph of the defendant was "not, directly or inferentially, relevant to any issue in the case."  But it would have a

prejudicial effect, encouraging the jury to convict him because he was a "lewd man." Ibid., quoting from Commonwealth v. LaSota, supra at 27. While inferential leaps could not connect the photographs in Darby to the issues in that case, here not even a small jump is necessary to link the defendant's statement to a central issue in this case: several days after the incident the defendant acknowledged that he was sexually attracted to a category of people that included the victim of the alleged sexual assault. See Commonwealth v. Jaime, 433 Mass. 575, 579 (2001) ("[I]n balancing the probative value against the risk of prejudice, the fact that evidence goes to a central issue in the case tips the balance in favor of admission").

Similarly, this court's conclusion in LaSota that the admission of evidence that purportedly bore on sexual proclivities was reversible error is a far cry from what is at issue in this case. In LaSota, where the defendant was charged with several sexual offenses against his minor daughter, we held that the admission of a pamphlet extolling the virtues of incest was reversible error. 29 Mass. App. Ct. at 17, 22, 28. We concluded that the material had no relevance: the Commonwealth did not establish a link between the pamphlet, found in the defendant's attic among other papers, and the defendant's beliefs or behavior. Id. at 25-26. In contrast with LaSota,

where there was "no evidence that the defendant . . . approved of [the pamphlet's] content," id. at 25, there is no daylight between the content at issue here and the defendant's own beliefs: it is his own statement about his own attraction that is at issue. Moreover, whereas the defendant in LaSota testified that he received the pamphlet at least several years before the claimed abuse began, id. at 23, here the defendant's statement was made within several days of the incident and in response to a friend's questions with respect to the incident.[8] LaSota was also "not a case in which the disputed evidence had direct connection with the crime charged." Id. at 26. Contrary to the defendant's contention, this case provides precisely that sort of connection. The judge did not abuse her discretion in admitting the defendant's statement to Guirand.

2. Dangerous weapon. General Laws c. 269, § 10(b), as appearing in St. 1974, c. 649, § 2, prohibits a person, "when arrested upon a warrant for an alleged crime," from being "armed with or ha[ving] on his person, . . . a . . . dangerous weapon."[9] "The statute is designed to 'discourage[] the carrying of

---

[8] We note again that, in her careful balancing of probative value and prejudicial effect, the judge excluded evidence of a similar statement the defendant made one year prior to the incident, while admitting only the statement at issue here -- made within days of the incident.

[9] The statute also prohibits the possession of specifically defined weapons under any circumstances. G. L. c. 269, § 10(b). The defendant was not charged under this provision.

dangerous weapons which can be used against arresting officers.'" Commonwealth v. Turner, 59 Mass. App. Ct. 825, 827 (2003), quoting from Commonwealth v. Thompson, 15 Mass. App. Ct. 974, 974 (1983). "[T]he term 'dangerous weapon' embraces objects that are dangerous per se, i.e., objects that are 'designed and constructed to produce death or great bodily harm' -- objects, in other words, that are 'designed for the purpose of bodily assault or defense' -- and objects that are dangerous as used, i.e., 'those things that become dangerous weapons because they are "used in a dangerous fashion."'" Commonwealth v. Turner, supra at 828 (citations omitted). "The essential question, when an object which is not dangerous per se is alleged to be a dangerous weapon, is whether the object, as used by the defendant, is capable of producing serious bodily harm." Commonwealth v. Marrero, 19 Mass. App. Ct. 921, 922 (1984).

This case turns on "whether the evidence permitted the fact finder to conclude that the defendant used or handled the knife in a manner that made it a dangerous weapon."[10] Commonwealth v. Turner, supra at 829. The defendant argues that, because he never removed the knife from his bag to use or even hold it, it was not dangerous. We disagree.

---

[10] The judge correctly instructed the jury that the kitchen knife is not dangerous per se. The Commonwealth does not argue to the contrary.

The defendant is correct that merely carrying a kitchen knife, without more, would not be prohibited by the statute. See id. at 830.  However, this case is not like Turner where, "[w]hatever the knife's potential for harm at other times and in other circumstances, the defendant did not use it in a manner that was capable of causing serious harm or even the apprehension of serious harm."  Id. at 829.  In Turner, the defendant's knife was folded in his back pocket, invisible to the arresting officers, and the defendant consented to a patfrisk because he had nothing "on him."  Id. at 826.  By contrast, here, the defendant had positioned a large kitchen knife such that its handle was protruding from the top of his backpack, both making it visible and providing the defendant easy access to an unsheathed knife even without removing the backpack he was wearing.[11]

The context of each arrest is important as well.  In Turner, the defendant was simply stopped on the street after the driver of the vehicle he was riding in committed a traffic violation, ibid.; here, the defendant was meeting at an arranged location with a police officer whom he knew to be conducting an investigation of him.  Moreover, the defendant had asked

---

[11] When the knife slid out of the bag -- after the officers began to take the defendant to the ground -- it was unsheathed. It is a reasonable inference that it was unsheathed while in the bag, facilitating rapid access and use.

Detective Halloran to meet him alone and then asked her to walk with him to a relatively secluded area, at night, from the busy location at which they had agreed to meet.[12]  The manner in which the defendant carried the knife and the circumstances surrounding his carrying the knife defeat any suggestion that he was doing so with an innocent purpose.  See Commonwealth v. Blavackas, 11 Mass. App. Ct. 746, 748, 752-753 (1981) (kitchen bread knife with eight-inch blade found in defendant's purse would not support conviction under G. L. c. 269, § 10[b], if defendant was carrying it "for an innocent purpose").  Under the circumstances, even though the defendant never wielded the knife, there was sufficient evidence for the jury to conclude that the defendant used the knife "in a manner that was capable of causing serious harm," placing him within the ambit of the statute.  Commonwealth v. Turner, supra at 829.

Judgments affirmed.

---

[12] Even if the defendant only brought the knife for his own protection rather than for offensive use, that would be sufficient, under the circumstances, to support the conclusion that it was a dangerous weapon.  See Commonwealth v. Thompson, 15 Mass. App. Ct. at 974 (steak knife carried in pocketbook and intended for protection was dangerous weapon).