COMMONWEALTH *vs.* ANTONIO JAIME.

Essex. January 9, 2001. - March 23, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & SOSMAN, JJ.

*Homicide. Practice, Criminal,* Capital case, Hearsay, State of mind. *Evidence,* Expert opinion, Hearsay, Cumulative evidence, Relevancy and materiality, State of mind. *Witness,* Expert.

At a murder trial, the judge should have excluded from evidence hearsay statements testified to by the Commonwealth's expert as constituting the basis for his conclusion that the defendant was capable of premeditation; however, the error did not prejudice the defendant in any significant way and a new trial was not required. [576-578]

At a murder trial, there was no error in the judge's admission in evidence of a statement of the defendant to a hospital registrar after his arrest that was highly probative of the defendant's state of mind immediately following the murder. [579-580]

INDICTMENT found and returned in the Superior Court Department on June 25, 1997.

The case was tried before *Christine M. McEvoy,* J.

*Patricia A. O'Neill,* Committee for Public Counsel Services, for the defendant.

*Robert J. Bender,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. A jury convicted the defendant, Antonio Jaime, of murder in the first degree on the theory of deliberate premeditation. On appeal, the defendant argues that the judge erred in (1) permitting the Commonwealth's expert to offer hearsay testimony indicating that the defendant had been in a jovial mood the day before the murder and contradicting the defendant's statement that he had been unemployed for at least one month before the murder; and (2) admitting evidence of a threatening statement that the defendant made to a hospital clerk shortly after the murder. After considering these arguments and reviewing the entire record pursuant to G. L. c. 278,

§ 33E, we find no reason to grant a new trial or to reduce the degree of guilt. Accordingly, we affirm the conviction.

1. *Background.*

On June 6, 1997, just before 6:30 A.M., the defendant, Antonio Jaime, shot his former girl friend, Maria Cabrera, in the hallway of her apartment as she was leaving for work. The victim's fifteen year old son, Ramon Cabrera, awoke when he heard a gunshot. He got out of bed, left his room, and saw his mother falling to the floor. The door from the kitchen to the hallway was open and Ramon could see the defendant standing in the hallway next to her body. As Ramon walked toward his mother's body, the defendant pointed the gun downward and shot her in the head. Ramon went over to his mother and, when he looked into the hallway, saw the defendant descending the stairs. The defendant looked back and pointed his gun at him. Ramon yelled for his older brother, Manuel, who had been sleeping in another room in the apartment. Manuel left his room and saw the defendant put the gun through the handrails and shoot Maria Cabrera in the head again. The defendant then proceeded down the stairs to leave the building, and, as Manuel testified, appeared "[c]almed, as if he hadn't done anything."

Later that morning, the police found the defendant at his daughter-in-law's house. Because he had sustained a bullet wound to his left wrist and his shoulder hurt, an officer summoned an ambulance to take the defendant to a hospital. There, the defendant was interviewed by the emergency room registrar regarding his hospital records. There was some difficulty in finding the records and the defendant became frustrated and angry as he awaited treatment. He asked the registrar "if she had known what he had done, or what he was capable of doing to [her]."

At the murder scene, the police found Maria Cabrera's body face down in a pool of blood in the hallway. At the top of the stairs, the police also found a note, written in Spanish and signed by the defendant, explaining to Ramon why he had murdered his mother.

2. *Expert Testimony.*

The defendant argues that it was prejudicial error for the judge to allow the Commonwealth's expert, Dr. Michael An-

nunziata, to give hearsay testimony to the effect that (1) the defendant had been in a jovial mood the day before the murder and (2) the defendant had been unemployed for only one week prior to the murder (as opposed to the two months' unemployment described by the defendant). On direct examination, Dr. Annunziata opined that the defendant had the capacity to premeditate. Explaining the basis for his opinion, he testified (still on direct examination) that he had interviewed a number of people who had seen the defendant at a softball game the day before the homicide, and that some of those people had related that the defendant seemed to be his "normal, usual self," and that he was "cheerful" and seemed to be in a good mood. Dr. Annunziata added that "[t]here was a general consensus that [the defendant] was sad." Because the defendant objected to this testimony, we review to determine whether there was prejudicial error. See *Commonwealth* v. *Martinez,* 431 Mass. 168, 173 (2000), citing *Commonwealth* v. *Vinnie,* 428 Mass. 161, 164 n.3, cert. denied, 525 U.S. 1007 (1998).

In *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 531-532 (1986), we approved the rule articulated in Proposed Mass. R. Evid. 705. See *Commonwealth* v. *Daye,* 411 Mass. 719, 742-743 (1992). Proposed Mass. R. Evid. 705 provides: "The expert may testify in terms of opinion or inference and give his reasons therefor, without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on *cross-examination*" (emphasis added). Virtually identical to its Federal counterpart, "[t]he rule allows a witness to state his opinion or inferences he has drawn from the evidence, without first setting out during direct examination the underlying facts or data on which the testimony is based." P.J. Liacos, Massachusetts Evidence § 7.7.4, at 414 (7th ed. 1999). See *Department of Youth Servs.* v. *A Juvenile, supra* at 532, quoting Advisory Committee's Note on Proposed Rule 705 ("thrust of rule is to leave inquiry regarding the basis of expert testimony to cross-examination").

Taking the rule and its rationale into consideration, permitting the expert to offer the contested hearsay testimony on *direct examination* constituted error. The judge should have sustained

the defendant's objection and precluded the admission of hearsay statements irrespective of whether they formed the basis of the expert's opinion. If he had sought to, of course, defense counsel could have cross-examined Dr. Annunziata about the facts underlying his opinion.

The resulting prejudice to the defendant does not, however, warrant a new trial. There was nothing inflammatory about the statements. To the contrary, they cast the defendant in a sympathetic light. The solitary reference to the defendant's having been cheerful was qualified by the expert's comment that there was a "general consensus that [the defendant] was sad." In addition, the judge gave a limiting instruction contemporaneous with the prosecutor's initial inquiry into the basis of the expert's testimony.[1] Given this context, the judge's decision to admit the contested evidence was error, but the error did not prejudice the defendant in any significant way. See *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993); *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983).

For similar reasons, admitting the expert's testimony regarding what he had learned as to the length of the defendant's unemployment, although erroneous, was not prejudicial to the defendant. See *Commonwealth* v. *Freeman*, 430 Mass. 111, 118 (1999). Cf. *Commonwealth* v. *Rosario*, 430 Mass. 505, 515-516 (1999) (closing arguments). The expert's testimony that the defendant had been employed up until one week before the murder was merely cumulative of evidence on the same subject offered by other witnesses at trial.[2] These facts were presented to the jury without any risk of prejudice and for the limited purpose of establishing the basis of Dr. Annunziata's opinion.

---

[1]The judge instructed as follows: "Members of the jury, the doctor is allowed to testify as to the basis of his opinion, but that part of the testimony that relates to the basis of the opinion, to the degree that there are attributions of statements of other people, they are not admitted for the truth of the matter contained therein through this doctor. It is admitted for a limited purpose; for you, the jurors, to listen to what the basis of the doctor's opinion is, that he had given before he listed those bases."

[2]Christian Jerez, head of personnel at the defendant's former place of employment, testified that the defendant had been unemployed for about one or two weeks while the kitchen was being renovated. In addition, the defendant's expert, Dr. Marc A. Whaley, testified that the defendant had been unemployed for one week before the murder.

### 3. *Statement at the Hospital.*

The defendant next argues that it was prejudicial error for the judge to allow the hospital registrar to testify that, in the course of gathering the defendant's medical records, he asked her if she knew "what he had done, or what he was capable of doing to [her]." The defendant contends that this evidence was highly prejudicial because it suggested that the defendant was capable of killing again and portrayed him as "a man bent on homicide." The defendant maintains that the only function of this statement was to inflame the jury. Over the defendant's objection, the judge admitted the evidence because the defendant's mental condition was a live issue,[3] and the Commonwealth had to prove both deliberate premeditation and malice in order to sustain a conviction.

It is well within the discretion of the trial judge to determine whether the prejudicial effect of this evidence outweighs its probative value. *Commonwealth* v. *Woods*, 414 Mass. 343, 355, cert. denied, 510 U.S. 815 (1993), citing *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 299, cert. denied, 371 U.S. 852 (1962). In order to find an abuse of discretion, "it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985), quoting *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976). Here, the judge concluded that the evidence was highly probative because it went to the defendant's state of mind — the only live issue at trial. Given the overwhelming evidence that the defendant committed the criminal act, the sole question for the jury was whether he had the mental capacity to premeditate. It has long been held that, in balancing the probative value against the risk of prejudice, the fact that evidence goes to a central issue in the case tips the balance in favor of admission. *Commonwealth* v. *Medeiros*, supra at 352. *Saud* v. *Fast Forward, Inc.*, 41 Mass. App. Ct. 643, 648 (1996). Here, the contested statement was highly probative of the defendant's state of mind. It implied that, immediately following the murder, he fully understood

---

[3]There was some evidence suggesting that the defendant, in the immediate aftermath of the murder, had expressed confusion and uncertainty as to what he had done to the victim.

what he had done and was neither confused nor remorseful. Given that the defendant's state of mind was a primary issue at trial, the judge properly admitted the statement. Accordingly, there was no error.

4. *Section 33E Review.*

Pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the entire record. We find nothing that compels us to exercise our discretion to disturb the jury's verdict either by reversing the conviction and granting a new trial or by reducing the verdict.

*Judgment affirmed.*