NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11692

COMMONWEALTH  vs.  NATALIO FELIX.

Worcester.     December 19, 2016. - April 12, 2017.

Present: Gants, C.J., Botsford, Lenk, Hines, & Gaziano, JJ.[1]

Homicide. Practice, Criminal, Instructions to jury, Assistance of counsel, Capital case.

Indictment found and returned in the Superior Court Department on September 21, 2011.

A pretrial motion to suppress evidence was heard by Bruce R. Henry, J.; the case was tried before Kathe M. Tuttman, J., and a motion for a new trial, filed on March 16, 2015, was heard by her.

Leslie W. O'Brien for the defendant.
Jane A. Sullivan, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. The defendant, Natalio Felix, appeals from his conviction of murder in the first degree and the denial of his motion for a new trial. The defendant was convicted of the

---

[1] Justice Botsford participated in the deliberation on this case and authored this opinion prior to her retirement.

murder of his wife, Janice Santos, on the theory of deliberate premeditation.

The defendant's principal arguments on appeal concern the absence of any instruction on manslaughter; he claims that although he admittedly killed his wife, the trial evidence, and particularly his own trial testimony, entitled him to instructions on both voluntary and involuntary manslaughter, and that for several reasons, the absence of these instructions constituted error requiring reversal of his conviction and a new trial. The defendant also seeks relief pursuant to G. L. c. 278, § 33E. We affirm the defendant's conviction and the order denying his motion for a new trial, and decline to grant relief under G. L. c. 278, § 33E.

1. Background. We summarize facts that the jury could have found, and reserve discussion of additional evidence in connection with the issues raised. In May of 2011, the defendant and the victim had been married for a decade or more.[2] They jointly owned a home in Worcester where they lived with their son and daughter, aged ten and eleven, and the victim's sixteen year old son from a prior relationship. The defendant and the victim both held jobs outside the home, the defendant as a truck driver and the victim at the Superior Court in Worcester

---

[2] The evidence is conflicting as to whether they had married ten or fourteen years before the homicide.

County, but the defendant quit his job around this time, and the couple argued frequently, often about money. Their relationship, however, contained no history of physical violence.

During that month, following an argument with his stepson, the defendant left the couple's home and stayed with his sister at her home in Worcester for some time and then went to the Dominican Republic. He stayed there for about one week before deciding to return home. Still in contact with the victim via text messages both while staying with his sister and during his trip to the Dominican Republic, the defendant asked her to pick him up at the airport when he returned; she refused. Nonetheless, he did return to Worcester on June 6, 2011, and stayed at his mother's house, but slept at a friend's house on June 7, the night before the homicide.

On the night of June 7, the defendant exchanged a series of text messages with Tina Rodriguez, a mutual friend of his and the victim's. Pressing Rodriguez for the gossip she had heard about his marriage, the defendant sent a text message stating, "[The victim is] not who you think she is. She's a hypocrite," and continued, "She's supposed to be Christian. Laugh out loud

. . . . Let's see if God saves her from this one."[3] Asked to elaborate, the defendant answered only, "You will see. You know who I am." Rodriguez replied, "Remember that you have children with her. Don't do anything stupid." The defendant ended the exchange by asking that Rodriguez not tell the victim they had spoken.

At 12:44 A.M. on June 8, the defendant sent a text message to his sister saying, "Love sis. Thanks for everything," and another saying goodbye to his niece. He also asked his niece to "get his cell phone," to thank his mother "for everything that she had done for him," and to relay his message that, "if anything happens to me just let [my mother] know that I'm sorry and that I love her." Forensic analysis of the defendant's cellular telephone revealed a calendar entry for June 8, 2011, reading, "Ju[d]gment Day." There were no other calendar entries for the six-month period beginning January 1, 2011, except for one doctor's appointment on a day in March.

The defendant arrived at his and the victim's home early on the morning of June 8, 2011. His stepson already had left for school; his son and daughter were awake and getting ready for school; the victim was in the master bedroom. Having let

---

[3] The victim was very religious, and attended church four or five nights per week, accompanied by her children but generally not by the defendant. The defendant exercised at a gym on many evenings.

himself into the house using the keys he still had, the defendant spoke to no one before entering the master bedroom and locking the door behind him. The children, both outside the bedroom, heard "a weird gasp," and "very loud thuds" coming from inside. Unable to open the bedroom door, they looked underneath the door and saw a pair of black and white pants, along with "legs and feet wiggling." The defendant's son asked through the door, "What are you doing to my mom? Come and show yourself," and heard his father's voice respond, "It's me." His daughter also recognized the defendant's voice saying, "Be quiet" from within the room. About five minutes later, the defendant emerged from the bedroom, told his children their mother was sick, asked whether they had brushed their teeth, and drove them to school.

The defendant then returned to his and the victim's home. According to what he told the police later that morning and told the jury at trial, when the defendant reentered the house, he did not check on the victim or go to the bedroom, but twice attempted to hang himself with a rope from the second-floor staircase. Each time, however, the rope broke, and in falling, he sustained injuries to his neck and face and lost consciousness for a period of time. When he regained consciousness, he drove the victim's automobile to his mother's house and left his house key and cellular telephone with his

stepfather.

The defendant proceeded to the Worcester police station, arriving there at approximately 9 A.M. He entered the station and reported to the officer at the front desk that he had killed his wife. He wore a black and white track suit and the victim's employment identification badge on a lanyard around his neck. Police observed that the defendant had dried blood in both nostrils, a split lip, and a ligature mark on his neck. In separate morning and afternoon interviews, the defendant spoke with police, waiving his Miranda rights each time.[4]

As the defendant's first interview with the police was taking place, other police officers went to the defendant's home to investigate. They found the victim lying on the bed of the master bedroom; she was dead. The victim's neck showed three ligature marks, and the tissue underneath the marks showed hemorrhaging consistent with blunt trauma. Her tongue was bruised, her neck cartilage fractured, and her face spotted with petechial hemorrhages. The victim died as a result of asphyxia due to ligature strangulation, which would have required the

---

[4] In the interval between the two police interviews, the defendant was taken to the hospital for examination and treatment of his injuries. Both police interviews were video and audio recorded, and copies of the recordings were in evidence at trial and played for the jury. In each interview statement and in his trial testimony, the defendant described his interactions with the victim on the morning of June 8. We summarize this evidence, infra.

application of sufficient pressure to her neck for three to five minutes.[5]

In September, 2011, a Worcester County grand jury indicted the defendant for murder. Because the victim had worked in the Superior Court in Worcester County, the case was transferred by agreement of the parties to the Superior Court in Middlesex County. After an evidentiary hearing, a judge of the Superior Court denied the defendant's motion to suppress his statements to the police, and the case was tried before a second Superior Court judge in October, 2012. The jury were instructed on murder in the first degree on theories of premeditation and extreme atrocity or cruelty, and also murder in the second degree; the judge declined to instruct on voluntary or involuntary manslaughter. The jury found the defendant guilty of murder in the first degree based on deliberate premeditation, and he was sentenced to life in prison without parole.

---

[5] Although the specific murder weapon was not identified, when the police went to the defendant's and the victim's house on the morning of June 8, 2011, they found various cords in rooms and in the halls on both floors of the house. Police collected "anything that appeared to be out of place," including a black telephone charger found lying on the floor next to the bed in the master bedroom; a blue rope in the first-floor hall; a knotted, cut white electrical cord also found in the first-floor hall; a blue cord in the second-floor hall; a blue rope tied to the second-floor banister; and a cut white electric cord recovered from the daughter's bedroom. The record does not indicate that any forensic analysis of these cords and ropes was conducted.

The defendant appealed from his conviction and, represented by new appellate counsel, filed a motion for a new trial in March, 2015.  He argued in the motion that his trial counsel's failure to request a voluntary manslaughter instruction had deprived him of a viable defense and constituted ineffective assistance of counsel.  After a nonevidentiary hearing, the trial judge denied the motion in a written memorandum of decision.  The defendant appealed from the denial of his motion, which we consider along with the defendant's appeal from his conviction.

2.  Discussion.  a.  Manslaughter instructions.  The defendant argues that his trial counsel rendered ineffective assistance by failing to request a jury instruction on voluntary manslaughter based on heat of passion caused by reasonable provocation or sudden combat, and contends alternatively that even if his trial counsel is found to have raised the possibility of a voluntary manslaughter instruction, the judge's declining to give it created a substantial likelihood of a miscarriage of justice that requires reversal of his conviction.  He argues further that the judge committed error in declining his request for a jury instruction on involuntary manslaughter, and claims that reversal is required for this reason as well.  For the reasons we discuss hereafter, we disagree that reversible error occurred.  We begin, however, by summarizing

the defendant's statements to the police[6] and trial testimony describing his encounter with the victim on the morning of June 8, 2011, because these provide the sources of trial evidence on which the defendant's arguments are based and the only sources on which they could be based.

    i.  <u>The defendant's statements and trial testimony</u>.  The defendant initially told a police officer in the station lobby that he had killed his wife.  Brought upstairs for questioning, he told detectives that he had gone to his house that morning hoping to reconcile with his wife, but instead they fought.  He could not recall which of them had initiated the struggle, saying, "We didn't hit each other.  We just grabbed each other" and "just started swinging at each other."[7]  Asked whether she had hit him "with anything," the defendant indicated that she had not.[8]  Rather, "[S]he was just punching me and stuff. . . . And then I lost it."  Although a "struggle" ensued on the floor, he could not account for the victim's return to the bed because as soon as they started arguing, he "blanked out."  To the

---

[6] The video and audio recordings of both police interviews were played for the jury during trial and admitted as trial exhibits.  See note 4 and accompanying text, <u>supra</u>.

[7] Although the record is silent as to the victim's and the defendant's relative sizes, it was undisputed that the defendant lifted weights at least three or four times per week.

[8] The defendant denied that his wife had caused his injuries, explaining that they were self-inflicted.

question whether he had punched the victim, the defendant responded, "No. I strangled her." He could not remember actually strangling the victim, saying that after he "just snapped," it was "all a blank." Indeed, throughout both police interviews, he repeatedly said that he had "just snapped," and that he did not "remember anything," adding, "My head was going crazy," and "I was just crazy."

When asked about his suicide attempts, the defendant explained that he "couldn't live with [him]self" after strangling the victim. He also said that he "realized what [he had] done" when he regained consciousness after the failed attempts. The defendant told police that "after [he] woke up" he drove directly to the station, and denied making any stops or telephone calls. When police asked about his cellular telephone, the defendant told them alternately that he did not have it, that it had been disconnected, that he did not know what he had done with it, and that he did not know where it was.

The defendant's trial testimony about the morning of June 8 was similar in most respects to his statements to police, but newly introduced the idea that his wife had initiated the fight. He testified that he went to the house on the morning of June 8 with peaceful intent to "get [his] family back." When his wife saw the defendant in their bedroom, however, she immediately asked, "What are you doing here?" and "lunged" at him. After

the victim "started swinging at" and "punching" the defendant, he "just snapped" and remembered nothing that followed until he emerged from the bedroom to speak to the children.

During a charge conference that preceded the defendant's trial testimony, the defendant requested a jury instruction on manslaughter -- without specifying whether he was requesting voluntary, involuntary, or both -- based on anticipated evidence that he "blacked out, that he did not intend to harm or kill his wife." The Commonwealth opined that the defendant's claim to have "blacked out" or "snapped" did not "rise to the level of either voluntary or involuntary manslaughter." The judge saw no evidence warranting jury instructions on "heat of passion on reasonable provocation" or "[h]eat of passion induced by sudden combat." She also concluded that no evidence warranted an involuntary manslaughter instruction. At the final charge conference, after the close of the evidence, the defendant specifically requested an involuntary manslaughter instruction. The judge denied the request, and no manslaughter instructions were given to the jury.

"If any view of the evidence in a case would permit a verdict of manslaughter rather than murder, a manslaughter charge should be given" (citation omitted). Commonwealth v. Sirois, 437 Mass. 845, 853 (2002). No matter how incredible a defendant's testimony, "he is entitled to an instruction based

upon the hypothesis that it is entirely true." Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006), quoting Commonwealth v. Campbell, 352 Mass. 387, 398 (1967).

ii. Voluntary manslaughter. As previously stated, the defendant argues that trial counsel was ineffective for failing to request an instruction on voluntary manslaughter. The portion of the trial record just summarized, however, indicates that regardless of whether the defendant made such a request, the judge clearly considered the question of a voluntary manslaughter instruction, ultimately deciding that the evidence did not warrant giving it. In the end, it is unimportant whether we analyze the absence of an instruction on voluntary manslaughter as a claim of ineffective assistance of counsel or a claim of judicial error, because the question raised by both claims is whether the absence of a voluntary manslaughter instruction, whether caused by counsel or the judge, created a substantial likelihood of a miscarriage of justice by creating an error that likely influenced the jury. See Commonwealth v. Wright, 411 Mass. 678, 681-682 (1992), S.C., 469 Mass. 447 (2014).

A voluntary manslaughter instruction on the theory of

provocation[9] requires evidence raising a reasonable doubt "that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." Commonwealth v. Walden, 380 Mass. 724, 728 (1980). See Model Jury Instructions on Homicide 64-65 (2013).[10] By this standard, the defendant's trial testimony may have demonstrated subjective provocation. We are not to judge his credibility, Acevedo, 446 Mass. at 442-443, and he testified repeatedly that he had not intended to kill the victim but snapped after she lunged at him and started punching him. If the question whether to give a manslaughter instruction is at all close, especially in a case like this one where the defendant testifies, prudence favors giving the instruction.

However, a theory of reasonable provocation also requires an objective showing that the precipitating event would have

---

[9] Both in discussing voluntary manslaughter during the first charge conference and in her memorandum of decision on the defendant's motion for a new trial, the judge focused on sudden combat. On appeal, however, the defendant emphasizes provocation. The theories are closely related, and the distinction does not make a difference in this case.

[10] Although the 2013 Model Jury Instructions on Homicide had not yet been formally approved by this court at the time of trial, the trial judge informed the parties that she would be using the new instructions, and used them in charging the jury.

provoked heat of passion in the ordinary person.  Walden, 380
Mass. at 728.  See Commonwealth v. Pierce, 419 Mass. 28, 31
(1994).  Accordingly, "physical contact between a defendant and
a victim is not always sufficient to warrant a manslaughter
instruction, even when the victim initiated the contact."
Walden, supra at 727.  This may be especially true where the
defendant outweighs and is physically far more powerful than the
victim, and the defendant uses a weapon or excessive force.
See, e.g., Commonwealth v. Bianchi, 435 Mass. 316, 329 (2001)
("Bianchi's further testimony that the victim punched him in the
face during their 'argument' adds little to his claim of
provocation, where he intentionally precipitated the
confrontation in violation of the protective order, was a
weightlifter who outweighed the victim by more than 170 pounds,
and was armed with a fully loaded weapon"); Commonwealth v.
Parker, 402 Mass. 333, 335, 344 (1988), S.C., 412 Mass. 353
(1992) and 420 Mass. 242 (1995) (in choking murder of elderly
disabled man, provocation "untenable" despite defendant's
testimony that victim had twice punched him in face);
Commonwealth v. Brown, 387 Mass. 220, 227 (1982) (evidence that
unarmed victim choked defendant, her husband, with his shirt did
not amount to provocation warranting manslaughter instruction,
especially where he stabbed victim twenty-seven times);
Commonwealth v. Rembiszewski, 363 Mass. 311, 321 (1973), S.C.,

391 Mass. 123 (1984) ("It is an extravagant suggestion that scratches by the wife could serve as provocation for a malice-free but ferocious attack by the defendant with a deadly instrument").[11]

Here, the evidence supporting objective provocation was weak:  according to his trial testimony, the defendant showed up uninvited and surprised the victim by entering the bedroom as she was getting dressed; he perceived immediately that the victim did not want him there, and locked the bedroom door; and in response, the victim "lunged at" and punched him.  The defendant did not provide any information in his testimony or otherwise as to the force of the punch or where on his body it landed -- although when speaking to the police soon after the homicide, the defendant stated that the injuries on his face and to his neck were not caused by the victim but were the result of his failed attempts to hang himself.  In these circumstances,

---

[11] The judge's decision on the defendant's motion for a new trial reasoned that the objective prong was unmet in part because the victim presented no "threat of serious harm" to the defendant, citing Commonwealth v. Ruiz, 442 Mass. 826, 838-839 (2004).  Although, as the cases just cited in the text reflect, relative size and strength of a defendant and a victim may be a pertinent factor in evaluating whether a voluntary manslaughter instruction is warranted (on theories of either reasonable provocation or sudden combat), and in that vein, the fact that the victim did not pose a threat of serious physical harm may itself be pertinent, it is by no means required that a victim pose such a threat in order for a voluntary manslaughter instruction to be required.

whether or not the victim's conduct caused the defendant himself to "snap," her conduct does not appear to be the sort that is objectively likely to "eclipse [an ordinary person's] capacity for reflection or restraint."  Walden, 380 Mass. at 728.

Even if, in light of the defendant's testimony, the better course to follow here would have been to give a voluntary manslaughter instruction, reversal is not required.  That is, if we were to assume that there was error -- either in counsel's failure specifically to request a voluntary manslaughter instruction or in the judge's failure to give it -- the error was not "likely to have influenced the jury's conclusion." Wright, 411 Mass. at 682.  The evidence was undisputed that irrespective of what started the physical interaction between the defendant and the victim, she died from being strangled by a ligature, and the defendant was the person who strangled her. Even if the jury were to have found, as the defendant stated, that the defendant had returned home on the morning of the homicide with peaceful intent to reconcile and the victim punched him upon seeing him in the bedroom, the time required to strangle the victim with a ligature supported a finding of deliberate premeditation inconsistent with sudden provocation. See Commonwealth v. Garabedian, 399 Mass. 304, 317 (1987) (although defendant arrived at scene of crime unarmed and with peaceful intent, heat of passion did not mitigate deliberately

premeditated murder by strangulation and blunt force).  Compare Commonwealth v. Vargas, 475 Mass. 338, 366 (2016) (reducing murder in first degree to voluntary manslaughter where jury had rejected theory of deliberate premeditation).  By the defendant's own admission, he and the victim had been "arguing for weeks" before the murder.  See Commonwealth v. Zagrodny, 443 Mass. 93, 107 (2004) (no voluntary manslaughter instruction required, where marital tension was hardly "sudden" given that relationship between victim and defendant had been strained by financial difficulties and they had argued day before killing).  The night before the murder, he bid farewell to family members, arranged for them to collect his cellular telephone, and ignored a friend's warning not to do "anything stupid."  He created a calendar entry for June 8 called "Ju[d]gment Day," entered the house when the family member best positioned to protect the victim would be absent, and locked the bedroom door behind him.  After strangling the victim, the defendant told his children their mother was sick and drove them to school.  He did not check on her, but twice attempted suicide "because [he] couldn't live with [him]self."  Before going to the police station, he left his cellular telephone with his stepfather but later claimed that he did not have it, that it had been disconnected, that he did not know what he had done with it, and that he did not know where it was.  See Sirois, 437 Mass. at 853-855 & n.9

(defendant's statement to police and conduct after shooting wife demonstrated that victim's act of pointing gun at defendant did not generate passion, anger, fear, fright, or nervous excitement required for reasonable provocation).

The jury's verdict of murder in the first degree by deliberate premeditation was strongly supported by the evidence, and in the circumstances of this case, we are persuaded that it was highly unlikely that the jury would have been influenced by an instruction on voluntary manslaughter. There was no substantial likelihood of a miscarriage of justice on account of the absence of this instruction.

iii. <u>Involuntary manslaughter</u>. The defendant also claims error in the judge's denial of his request to instruct the jury on involuntary manslaughter. Again, if any view of the evidence would permit a verdict of manslaughter -- whether voluntary or involuntary -- rather than murder, a manslaughter instruction should be given. <u>Commonwealth</u> v. <u>Degro</u>, 432 Mass. 319, 330 (2000), and cases cited.

The defendant was not entitled to an instruction on involuntary manslaughter in this case. "A verdict of involuntary manslaughter is warranted 'only where the defendant caused an unintentional death (1) during the commission of an act amounting to wanton or reckless conduct, or (2) during the commission of a battery'" (citation omitted). <u>Degro</u>, 432 Mass.

at 331.  With respect to the latter, under our cases, the
battery in question must be one that does not amount to a
felony, but one that the defendant knew or should have known
endangered human life.  See Commonwealth v. Simpson, 434 Mass.
570, 590 (2001); Commonwealth v. Catalina, 407 Mass. 779, 783
(1990).  See also Model Jury Instructions on Homicide 73, 87-90
(2013).

The defendant requested an involuntary manslaughter
instruction based on this circumstance, that is, based on
commission of a battery not amounting to a felony.  But the
evidence in the case was that the defendant placed a ligature
around the victim's neck and pulled with sufficient force for
three to five minutes to cut the flow of oxygen to the victim's
brain, cause hemorrhaging to the underlying tissue, a fracture
to her neck cartilage, and petechial hemorrhages on her face.
"An involuntary manslaughter charge is not required when it is
obvious that the risk of physical harm to the victim creates a
'plain and strong likelihood that death would follow.'"  Degro,
432 Mass. at 331, quoting Commonwealth v. Brooks, 422 Mass. 574,
578 (1996).  See Commonwealth v. Linton, 456 Mass. 534, 552-553
(2010) (in light of medical examiner's undisputed testimony
regarding physical force used in strangling victim, no
reasonable jury could have concluded that defendant lacked
malice where he manually strangled victim for at least ninety

seconds, did not call for emergency aid, and left victim unconscious behind locked door).[12]

There was no error in declining to give an instruction unwarranted by the evidence.  See Linton, 456 Mass. at 553, citing Commonwealth v. Nardone, 406 Mass. 123, 132 (1989) ("judge should not instruct jury on lesser offense not supported by reasonable view of evidence").

b.  "Cool reflection."  Although he did not object at trial, the defendant contends that the judge's failure to inform the jury of a requirement of "cool reflection" in her instruction defining deliberate premeditation as an element of murder in the first degree created a substantial likelihood of a miscarriage of justice.  A judge defining deliberate premeditation for a jury is not obligated to inform them that they must find that the defendant decided to kill after having an opportunity for "cool" reflection.  Where that phrase is not required, Commonwealth v. LeClair, 429 Mass. 313, 318 & n.7 (1999), and where the trial judge here instructed the jury using

_____

[12] See also Commonwealth v. Mendes, 441 Mass. 459, 476 (2004) (risk created by "prolonged and forceful strangulation . . . constitutes a plain and strong likelihood of death"); Commonwealth v. Fitzmeyer, 414 Mass. 540, 547-548 (1993) (involuntary manslaughter instruction not warranted where evidence indicated defendant choked victim to death); Commonwealth v. Garabedian, 399 Mass. 304, 315-316 (1987) (involuntary manslaughter instruction not warranted where defendant strangled victim and threw rocks at her face).

the Model Jury Instructions on Homicide,[13] there was no error and, accordingly, no substantial likelihood of a miscarriage of justice.

c.  Review pursuant to G. L. c. 278, § 33E.  Finally, the defendant argues that pursuant to G. L. c. 278, § 33E, we should reduce the murder verdict because there is reason to doubt that he acted with deliberate premeditation.  After reviewing the entire record of the case, we decline to do so.

Judgment affirmed.

Order denying motion for
a new trial affirmed.

---

[13] Specifically, the judge instructed as follows:

"The third element is that the defendant committed the murder with deliberate premeditation, that is, he decided to kill after a period of reflection.  Deliberate premeditation does not require any particular length of time of reflection.  A decision to kill may be formed over a period of days, hours or even a few seconds.  The key is the sequence of the thought process.  First, the consideration of whether to kill.  Second, the decision to kill, and third the killing arising from that decision.  There is no deliberate premeditation where the action is taken so quickly that a defendant takes no time to reflect on the action and then decide[s] to do it."

This instruction tracked the language in Model Jury Instructions on Homicide 39-40 (2013).