NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

21-P-873

COMMONWEALTH

vs.

HAYDEN DELAFUENTE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Hayden Delafuente, appeals from his convictions, after a Superior Court jury trial, of murder in the second degree, G. L. c. 265, § 1; assault and battery by means of a dangerous weapon causing serious bodily injury, G. L. c. 265, § 15A (c) (i); and armed assault with the intent to kill, G. L. c. 265, § 18 (b). We conclude that the trial judge acted within his discretion in admitting Marion Wilder's out-of-court statement for the limited purpose of bolstering the witness's identification of Wilder. We further conclude that the record does not contain indisputable facts establishing that defense counsel's failure to argue for a manslaughter verdict

_____

[1] "As is our practice, we spell the defendant's name as it appears in the indictments." Commonwealth v. Tinsley, 487 Mass. 380, 380 n.1 (2021).

was manifestly unreasonable, and that evidence of the defendant's statements that the police should not worry about how he got injured did not create a substantial risk of a miscarriage of justice.  Accordingly, we affirm.

1.  Background.  On the evening of May 28, 2017, the defendant and his friends went to the Chit Chat Lounge (Chit Chat)[2] in downtown Haverhill.  At approximately 11:52 P.M., the defendant left the Chit Chat.  Approximately ten minutes later, the defendant returned, this time accompanied by Wilder.  When the defendant tried to reenter the Chit Chat, the bouncer denied him reentry because he was too intoxicated.  Upset, the defendant spent over seven minutes begging the bouncer to let him back in.  The bouncer refused.  In response, the defendant pulled out a small blue flip knife and flashed it at the bouncer.  The bouncer immediately grabbed the knife and put it in his back pocket.  After hearing the commotion at the door, the bouncer's boss appeared and instructed the bouncer to return the knife to the defendant, who was standing in front of them. The bouncer reluctantly returned the knife, and the defendant left the Chit Chat, walking east toward the Barking Dog Ale House (Barking Dog).  Within minutes of leaving the Chit Chat, the defendant spotted two of his friends.  He excitedly

---

[2] The Chit Chat was a bar on Washington Street.  It is now called Moonshiners.

2

approached them, reversed the direction he had been traveling in, and headed toward the Chit Chat with his friends.

That same evening, the victims' friend group, which was comprised of three couples, had been out drinking to celebrate one couple's upcoming wedding and another couple's recent engagement. Around midnight, the group left the Chit Chat and proceeded to walk down Washington Street to go to another bar. Shortly thereafter, the group briefly stopped for one member to smoke a cigarette and another to relieve herself in the alley. One of the victims, Matthew Sabatino, went to grab a pack of cigarettes from his car. The other victim, Daniel Doore, leaned on a traffic cone that had been left out from sidewalk construction.

While the victims' friend group was waiting outside of the Barking Dog, the defendant and his two friends walked toward them. The defendant appeared "very angry" and was talking loudly and swearing. When the defendant first approached, he bumped into Doore, who was still leaning on the traffic cone. Doore glared at the defendant, and the defendant said, "what are you going to do about it?" Doore responded back with the same statement. The defendant then struck Doore. Although no one saw a knife, Doore was stabbed five times before falling to the

3

ground.[3]  At the time, Doore had possession of a red knife.[4]  As the altercation between the defendant and Doore unfolded, Sabatino began walking back from his car to rejoin his friends. Immediately after Sabatino reached his fiancée he was fatally stabbed in the chest.[5]  No one saw Sabatino or the defendant holding a knife.

That evening, Francis Wolf was walking to meet up with his friends when he observed the defendant hit a woman.[6]  Wolf approached the defendant, grabbed his shoulder, and punched him in the face.  The defendant fell to the ground and then fled the scene, walking east on Washington Street.  Doore and Sabatino lay bleeding on the ground.

At approximately 12:30 A.M., in response to a 911 call, police officers were dispatched to the Barking Dog.  When police cruisers on their way to the scene drove past the defendant, he removed his white baseball hat and stuffed it inside his black sweatshirt.  Before reaching the Barking Dog, an officer was flagged down by a man yelling that he had seen a man involved in the altercation.  The man described the defendant's appearance

---

[3] Doore sustained nonfatal stab wounds to his right hand, his left arm, and his lower right back.  Approximately one month later, Doore developed an aneurysm from the stab wound to his left arm, which required surgery.

[4] Doore, a plumber, testified that he always carried the knife with him for work.

[5] Sabatino died from the stab wound after ten days in a coma.

[6] The woman was Doore's fiancée.

4

and indicated that he had gone down Washington Street, toward the post office.  The officer drove in that direction and, upon seeing that the defendant matched the description, informed the defendant that the officer needed to speak with him and instructed him to put his hands on the officer's police cruiser. The officer pat frisked the defendant and recovered a blue folding knife from the defendant's front pants pocket.

After the patfrisk, another officer arrived to assist.  The first officer informed the defendant that he was investigating an incident that had occurred up the street.  In response, the defendant spontaneously stated that he "had been attacked."  The officer asked the defendant what happened, but the defendant did not elaborate.  In speaking with the second officer, the defendant stated that he was trying to get to his girlfriend's house and that his ear was injured.  When asked how he sustained the laceration on his ear, the defendant said, "forget it, nothing, forget it."  Because the defendant was injured, the officers called an ambulance, and the defendant was transported to the hospital.

When he arrived at the hospital at approximately 1:00 A.M., the defendant told the emergency room physician that he "did not want to be treated . . . and that he was going to leave."  After a brief competency exam, the defendant was found competent, and he left the hospital.  Shortly thereafter, officers observed the

5

defendant walking down the street and asked him whether he was willing to come back to the police station to speak with them. The defendant agreed. When he arrived at the police station, the defendant fell into a deep sleep. Despite several attempts, officers were unable to rouse him and placed him in protective custody.[7]

After the stabbings, police recovered the defendant's white hat near Merrimack Street.[8] The defendant's blood was found on his hat, his sweatshirt, and his left hand. Sabatino's blood was found on the blade of the defendant's knife. Doore's blood was found on the blade of his own knife.

2. Procedural history. The defendant was indicted on charges of first-degree murder of Sabatino, assault and battery by means of a dangerous weapon causing serious bodily injury of Doore, and armed assault with the intent to murder Doore. After a six-day trial, the jury convicted the defendant of assault and battery by means of a dangerous weapon causing serious bodily injury and the lesser-included offenses of second-degree murder and armed assault with the intent to kill. See Commonwealth v. Vick, 454 Mass. 418, 428 (2009) ("armed assault with intent to kill [is] a lesser included offense of armed assault with intent

---

[7] The jury did not hear that, when the defendant eventually woke up, he invoked his right to counsel.

[8] Washington Street becomes Merrimack Street east of the post office.

6

to murder").  Concluding that, "based on his criminal record, he is an extremely dangerous person" who "has led a lifetime of violence," the judge sentenced the defendant to life in prison with parole eligibility after twenty-five years on the second-degree murder conviction, with consecutive sentences of five to seven years on the other charges (which would run concurrent to each other).  See G. L. c. 279, § 24; Crowell v. Massachusetts Parole Bd., 477 Mass. 106, 115 (2017) ("judges sentencing on convictions for murder in the second degree now must fix a minimum term as a parole eligibility date").  This appeal followed.

3.  Admission of Wilder's statement.  "Relevant evidence is admissible as long as the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." Commonwealth v. Reyes, 483 Mass. 65, 74 (2019), quoting Commonwealth v. Wall, 469 Mass. 652, 661 (2014).  Accord Mass. G. Evid. § 403 (2022) ("court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice").  "[I]n balancing the probative value against the risk of prejudice, the fact that evidence goes to a central issue in the case tips the balance in favor of admission."  Commonwealth v. Jaime, 433 Mass. 575, 579 (2001). On appeal, "[w]e review evidentiary decisions of the trial judge

7

for an abuse of discretion." Commonwealth v. Huang, 489 Mass. 162, 172 (2022).

Here, the judge acted within his discretion in admitting Wilder's out-of-court statement for the limited purpose of bolstering the witness's identification of the person speaking on the phone. See Commonwealth v. Bradshaw, 86 Mass. App. Ct. 74, 78 (2014) (no abuse of discretion where "[t]he judge admitted the statement for a limited purpose"). Over defense counsel's objection at trial, the judge allowed Doore's fiancée to testify that she recalled Wilder's appearance because, immediately after Doore was stabbed, she overheard Wilder on the phone say, "what the fuck did you guys just do, you got to get out of here." The judge instructed the jury that they could consider this testimony "for the limited purpose of [the witness's] identification of the person who is on the phone and for no other purpose."[9] See Commonwealth v. Botticelli, 51 Mass. App. Ct. 802, 805 (2001) (judge instructed jury "on the use of that testimony 'for the limited purpose of identification'").

The defendant challenges the statement as inadmissible hearsay. See Commonwealth v. Rivera, 83 Mass. App. Ct. 581, 587

---

[9] To the extent the limiting instruction could have been stronger, there was no objection. See Commonwealth v. Bonds, 445 Mass. 821, 835 (2006) ("the defendant did not ask for such an instruction, and the instruction given was adequate to minimize the potential for prejudice").

8

(2013).  "The hearsay rule prohibits the admission only of out-of-court assertions offered to prove the truth of the matter asserted."  Commonwealth v. Kozubal, 488 Mass. 575, 584 (2021), quoting Commonwealth v. Siny Van Tran, 460 Mass. 535, 550 (2011).  The statement here, however, was admitted solely for the "nonhearsay purpose" of bolstering the witness's identification of the speaker on the phone.  Rivera, supra at 588.  See Commonwealth v. Silanskas, 433 Mass. 678, 693 (2001) (statements made by victim's wife "that [her] husband was alive and living in a monastery and that he left the area because he could not find work. . . . clearly were not offered for their truth").  Where the judge instructed the jury that the statement was admitted for a limited purpose, "[w]e presume that a jury understand and follow limiting instructions."  Commonwealth v. Keown, 478 Mass. 232, 243 (2017), quoting Commonwealth v. Donahue, 430 Mass. 710, 718 (2000).

The defendant also contends that Wilder's statement lacked probative value and was unfairly prejudicial.  The statement was probative because it tended to exclude Wilder as the stabber by reinforcing the witness's identification of Wilder as a person who remained on scene after Doore was stabbed.  This was especially true where defense counsel appeared to pursue a third-party culprit defense throughout most of trial.  "In these circumstances, the statement's probative value stems from the

9

fact that the statement was made, rather than to prove the facts asserted within." Commonwealth v. Yat Fung Ng, 491 Mass. 247, 259 (2023). Given that there was no evidence why Wilder was on the phone or whom he was speaking with, the judge reasonably concluded that the probative value outweighed any prejudice. See Commonwealth v. Shruhan, 89 Mass. App. Ct. 320, 324 (2016) ("A fair reading of the testimony does not support a conclusion that the testimony was unduly prejudicial to the defendant").[10] Accordingly, in light of the limiting instruction, admission of the statement was within the judge's discretion. See Commonwealth v. Walker, 460 Mass. 590, 613 (2011) (no abuse of discretion in admitting testimony where "the judge gave forceful limiting instructions").

4. Ineffective assistance of counsel. We review an ineffective assistance of counsel claim to determine whether "(1) the 'behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer' and (2) such failing 'likely deprived the defendant of an otherwise

---

[10] Indeed, the testimony that the jury ultimately heard was more friendly to the defendant than the expected testimony that the judge ruled on. At sidebar, the Commonwealth represented that the witness would testify that Wilder said over the phone, "I know what you did," and that the witness then told Wilder, "you better not leave, the police are coming, you need to stay, you know what happened." Defense counsel did not argue below or on appeal that any discrepancies in the proposed testimony and the actual testimony should have caused the judge to reconsider his discretionary decision.

10

available, substantial ground of defence.'" Commonwealth v. Tavares, 491 Mass. 362, 365 (2023), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). "If a defendant challenges the 'tactical or strategic decisions[]' of trial counsel, he must establish them as 'manifestly unreasonable.'" Commonwealth v. Shanley, 455 Mass. 752, 768 (2010), quoting Commonwealth v. Montanez, 410 Mass. 290, 295 (1991).

For the first time on appeal, the defendant claims that trial counsel's failure to argue for a manslaughter verdict constituted ineffective assistance of counsel.[11] An ineffective assistance of counsel claim "based solely on the trial record" is the "'weakest form' because 'it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight.'" Commonwealth v. Diaz, 448 Mass. 286, 289 (2007), quoting Commonwealth v. Peloquin, 437 Mass. 204, 210 n.5 (2002). "[T]he preferred method for raising a claim of ineffective assistance of counsel is through a motion for a new trial." Commonwealth v. Zinser, 446 Mass. 807, 810 (2006). "Relief may be afforded on such a claim 'when the factual basis of the claim appears

---

[11] The defendant has explicitly reserved his claims concerning whether trial counsel adequately presented a third-party culprit defense and whether trial counsel's decision to switch from a third-party culprit defense to self-defense constituted ineffective assistance of counsel for a future motion for a new trial.

11

indisputably on the trial record.'"  Commonwealth v. Gorham, 472

Mass. 112, 116 n.4 (2015), quoting Zinser, supra at 811.

On this record, defense counsel's failure to argue for a

manslaughter verdict was not manifestly unreasonable where the

mitigating evidence was scant and the judge instructed the jury

on self-defense, manslaughter based on reasonable provocation,

sudden combat, and excessive force in self-defense.[12]  See

Commonwealth v. Glover, 459 Mass. 836, 844 (2011) ("it was not

manifestly unreasonable for defense counsel to proceed solely on

a theory of self-defense").  Under the theory of manslaughter by

reasonable provocation, "the provocation must 'come from the

victim' and [crucially, in the instant case] be directed at the

defendant."  Commonwealth v. Gamboa, 490 Mass. 294, 310 (2022),

quoting Commonwealth v. Yat Fung Ng, 489 Mass. 242, 258 (2022).

Here, there was no evidence that Sabatino spoke to the defendant

or made any gestures and little evidence that he took any action

aside from walking back to his friends and "c[o]m[ing] right" to

---

[12] On appeal, the defendant argues that self-defense was not a
viable defense because there was no evidence that Sabatino
possessed or threatened the defendant with deadly force, and
evidence that the defendant had no reasonable opportunity to
retreat was lacking.  The purported absence of either of these
requirements of self-defense negates the defendant's argument
that trial counsel was ineffective for failing to argue
manslaughter based on the use of excessive force in self-
defense.  See Commonwealth v. Santos, 454 Mass. 770, 775 (2009)
("The jury cannot reach the question of excessive force in self-
defense unless they decide that the defendant has exercised his
right of self-defense in the first place").

12

his fiancée before he was fatally stabbed.  The testimony of Wolf that he "saw in the distance" that there were "two guys fighting one guy" was, at best, scant support for a theory of reasonable provocation.  Cf. Commonwealth v. Acevedo, 446 Mass. 435, 444 (2006) (reasonable provocation where victim "looked at [the defendant], made a fist, and ran toward him. . . . [then] knocked him down, and beat him").  In this case, "the evidence supporting objective provocation was weak."  Commonwealth v. Felix, 476 Mass. 750, 758 (2017).

For manslaughter based on sudden combat, the "victim . . . must attack the defendant or at least strike a blow against the defendant."  Commonwealth v. Howard, 479 Mass. 52, 58 (2018), quoting Commonwealth v. Espada, 450 Mass. 687, 696-697 (2008).  Given that there was no evidence that Sabatino was armed, Wolf's vague testimony provided little purchase for a theory of sudden combat.  Cf. Commonwealth v. Rodriquez, 461 Mass. 100, 109 (2011) ("Although the defendant was struck first, it was the defendant who originally tried to engage the victim in a fight, first by goading him, then by attempting, unsuccessfully, to strike the first blow").

Furthermore, if convicted of manslaughter, the defendant was facing a serious sentence and, "if the jury credited the defendant's claim of self-defense, he would be acquitted."  Glover, 459 Mass. at 844.  See Commonwealth v. Rhodes, 482 Mass.

13

823, 828 (2019) ("In many circumstances, it is not manifestly unreasonable for a defendant to forgo a possible defense with an eye toward a possible acquittal").  In the absence of a motion for a new trial and evidence from the defendant and trial counsel, we cannot discern whether the defendant requested that his counsel pursue an all-or-nothing defense.  Accordingly, "the defendant's claim of ineffective assistance is not indisputable."  Commonwealth v. Davis, 481 Mass. 210, 223 (2019).

5.  Evidence of the defendant's failure to explain how he got injured.  The defendant argues that it was error to admit testimony concerning his failure to explain how he got injured in response to certain questions posed by the police.  Because the defendant failed to object to the testimony at trial, "we review his claim of error for a substantial risk of a miscarriage of justice."  Commonwealth v. McCoy, 456 Mass. 838, 846 (2010).[13]

---

[13] Invoking Commonwealth v. Mahdi, 388 Mass. 679, 696 (1983), the defendant argues that errors of this nature are reviewed for harmless error, even in the absence of an objection.  We admit to some difficulty in understanding Mahdi, a post-Miranda silence, first-degree murder case which purports to apply both the harmless error beyond a reasonable doubt standard and the substantial risk of a miscarriage of justice standard, see id. at 690, 696, 699.  (Technically, the court should have applied the substantial likelihood of a miscarriage of justice standard, see Commonwealth v. Roberts, 378 Mass. 116, 123 [1979], but the Supreme Judicial Court treated substantial risk and substantial likelihood as interchangeable as late as 1987, see Commonwealth

14

"While the admission of a defendant's prearrest silence may not violate the due process principles of the United States Constitution, . . . testimony related to the defendant's silence in response to police questioning even before Miranda warnings are given may be inadmissible." Commonwealth v. Beneche, 458 Mass. 61, 73 n.13 (2010). For testimony to be inadmissible, the defendant must show that he "'manifest[ed] an expressed unwillingness to continue with the interview' as a whole." Commonwealth v. Weidman, 485 Mass. 679, 686 (2020), quoting Commonwealth v. Robidoux, 450 Mass. 144, 161 (2007). "[A] suspect's unwillingness to answer questions on a particular topic does not unambiguously indicate that the suspect is unwilling to continue speaking with police." Commonwealth v. Santos, 463 Mass. 273, 285 (2012).

Here, there was no substantial risk of a miscarriage of justice because the defendant did not clearly manifest an intent

---

v. Waters, 399 Mass. 708, 715 [1987], and did not specifically state the difference in the application of the two standards until 1988, see Commonwealth v. Glass, 401 Mass. 799, 807 [1988].) In any event, the Supreme Judicial Court has since repeatedly cited Mahdi while holding that unobjected-to errors involving a defendant's right to remain silent are reviewed under the traditional substantial likelihood of a miscarriage of justice standard, Commonwealth v. Letkowski, 469 Mass. 603, 617 & n.22 (2014); Commonwealth v. Johnston, 467 Mass. 674, 690-693 (2014); Commonwealth v. Beneche, 458 Mass. 61, 72 (2010), or the substantial risk of a miscarriage of justice standard, Commonwealth v. Connolly, 454 Mass. 808, 829 (2009); Commonwealth v. Brown, 451 Mass. 200, 209 (2008), in direct appeal first-degree murder cases and other cases, respectively.

to remain silent and instead "merely 'refus[ed] to answer certain questions.'" Weidman, 485 Mass. at 686, quoting Robidoux, 450 Mass. at 161 n.7. At trial, an officer testified that, after informing the defendant that he was investigating an incident that occurred up the street, the defendant spontaneously stated that he "had been attacked." The officer then testified that he "asked [the defendant] what happened and [the defendant] didn't elaborate with [him] any further." In speaking with a different officer, the defendant stated that he was trying to get to his girlfriend's house and that he was injured. The officer testified that when she asked the defendant about his injury he responded, "forget it, nothing, forget it." The defendant then continued to talk about his current girlfriend and prior girlfriends. At no point did the defendant invoke the right to remain silent or terminate the conversation. See Robidoux, supra at 161 (defendant's "willingness to share stories and discuss his guiding principles was interspersed with refusals to talk about his family. His unwillingness to answer questions about his family in these circumstances did not manifest an expressed unwillingness to continue with the interview"). "Because neither of the defendant's statements was a clear and unambiguous invocation of the right to remain silent, the defendant has failed to meet his burden." Weidman, supra at 687.

16

The defendant also challenges portions of the prosecutor's opening statement and closing argument that referenced evidence of the defendant's silence.[14]  Where the prosecutor intended to call officers who spoke with the defendant to testify at trial, she could describe the defendant's selective answers in her opening statement.  See Commonwealth v. DePina, 476 Mass. 614, 627 (2017) (opening statements "may reference anything that [a prosecutor] reasonably believes in good faith will be proved by evidence introduced" at trial).  Similarly, where defense counsel repeatedly argued at trial that the defendant was cooperating with the police, "the prosecutor was entitled to respond to the defendant's argument by asking the jury to" consider why the defendant willingly told officers that he was attacked but then told them to forget about it.  Commonwealth v. Rutherford, 476 Mass. 639, 644 (2017).  Moreover, the prosecutor referenced the defendant's selective responses not to suggest consciousness of guilt but rather to demonstrate that the defendant was able to make rational decisions and thus was not that intoxicated.  See Commonwealth v. Diaz, 478 Mass. 481, 487 (2017) ("closing arguments must be limited to the facts in evidence and the reasonable inferences that may be drawn

_____

[14] Because the defendant did not object to the prosecutor's opening statement or closing argument, we review for a substantial risk of a miscarriage of justice.  See Commonwealth v. Oliveira, 74 Mass. App. Ct. 49, 56 (2009).

17

therefrom").  "In these circumstances, there is no substantial risk of a miscarriage of justice."  Commonwealth v. Miranda, 458 Mass. 100, 117 (2010).

Judgments affirmed.

By the Court (Sullivan,
  Sacks & Ditkoff, JJ.[15]),

*Joseph F. Stanton*

Clerk

Entered:  April 20, 2023.

---

[15] The panelists are listed in order of seniority.